[No. B207285. Second Dist., Div. Five. Aug. 10, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMIE D. COX et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

---

†Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II. and III.B.–F.

338

**COUNSEL**

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant Jamie D. Cox.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Freddie Jones.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant Shawney D. Jackson.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Lance E. Winters, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

TURNER, P. J.—

## I. INTRODUCTION

Defendants, Freddie Howard Jones, Shawney Jackson, and Jamie D. Cox, appeal from their convictions for murder (Pen. Code,[1] § 187, subd. (a)) and the jurors' findings that a principal personally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b), (c), (d)) and that the murder was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(C).) Ms. Cox and Mr. Jackson were convicted of first degree murder. Mr. Jones was convicted of second degree murder. We affirm the judgments with modifications.

In the published portion of this opinion, we discuss defendants' arguments that the trial court failed to discharge the jury panel after the prosecutor exercised nine peremptory challenges against African-American jurors. We conclude the trial court complied with its constitutional obligation to engage in a sincere and reasoned effort to evaluate the nondiscriminatory justifications provided by the deputy district attorney. Thus, no constitutional error occurred during the jury selection process.

## II. FACTUAL BACKGROUND*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISCUSSION

### A. Prosecutor's Exercise of Peremptory Challenges

#### 1. Factual and procedural background

Mr. Jones first argues that the trial court utilized an improper standard in determining whether the prosecutor's justifications for excusing African-American jurors were pretextual. Defendants argue that the prosecutor improperly exercised peremptory challenges against African-American jurors. Ms. Cox argues that the trial court performed a "perfunctory analysis" of the prosecutor's explanation for the exercise of peremptory challenges. Mr. Jackson argues that the trial court failed to scrutinize the race-neutral reasons proffered by the prosecutor.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

*See footnote, *ante*, page 337.

As will be discussed in detail below, defense counsel made five separate "*Wheeler* motions" during the course of voir dire examination. The prosecutor made two similar motions. The trial court found a prima facie case as to each motion and allowed the parties to explain the exercise of their peremptory challenges. Thereafter, the trial court held all challenges were made on race-neutral grounds.

The voir dire examination in this case took place over six court days. The prosecutor was allowed 20 peremptory challenges. Each attorney for the four defendants was allowed five peremptory challenges, for a total of 20 challenges to be exercised jointly or independently. During the course of the voir dire, the prosecutor made 20 peremptory challenges. The defense exercised 18 peremptory challenges. The record does not reflect the number of African-Americans in the venire, on the final jury, or amongst the alternate jurors. Following the third defense motion made on the third day of jury selection, the trial court noted that there was one African-American juror on the panel and seven Latinos. The record reflects that the same African-American juror remained on the jury during the trial. The trial court also noted that at least one African-American juror was excused by defense counsel. But we have no record as to the number of African-American jurors who ultimately were involved in deliberations and the return of the verdicts and special findings.

## 2. Controlling legal authority

Our Supreme Court has held: "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race. (*Batson* [*v. Kentucky* (1986)] 476 U.S. [79,] 97 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *Georgia v. McCollum* (1992) 505 U.S. 42, 59 [120 L.Ed.2d 33, 112 S.Ct. 2348]; [*People v.*] *Wheeler*[ (1978)] 22 Cal.3d [258,] 276–277 [148 Cal.Rptr. 890, 583 P.2d 748].) Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84]; *People v. Avila*[ (2006)] 38 Cal.4th [491,] 541 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) . . . [¶] The *Batson* three-step inquiry is well established. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. (*Rice v. Collins* (2006) 546 U.S. 333, 338 [163 L.Ed.2d 824, 126 S.Ct. 969].) The three-step procedure also

applies to state constitutional claims. (*People v. Bonilla, supra,* 41 Cal.4th at p. 341; *People v. Bell* (2007) 40 Cal.4th 582, 596 [54 Cal.Rptr.3d 453, 151 P.3d 292].)" (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613 [80 Cal.Rptr.3d 98, 187 P.3d 946]; see *People v. Taylor* (2010) 48 Cal.4th 574, 611–612 [108 Cal.Rptr.3d 87, 229 P.3d 12]; *People v. Hamilton* (2009) 45 Cal.4th 863, 898 [89 Cal.Rptr.3d 286, 200 P.3d 898]; *People v. Lancaster* (2007) 41 Cal.4th 50, 74 [58 Cal.Rptr.3d 608, 158 P.3d 157]; see also *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410]; *People v. Mills* (2010) 48 Cal.4th 158, 173–174 [106 Cal.Rptr.3d 153, 226 P.3d 276]; *People v. Cruz* (2008) 44 Cal.4th 636, 655 [80 Cal.Rptr.3d 126, 187 P.3d 970].)

We review a trial court's denial of a motion premised upon the improper use of a peremptory challenge with deference, examining only whether substantial evidence supports its conclusions. (*People v. Mills, supra,* 48 Cal.4th at p. 176; *People v. Lenix, supra,* 44 Cal.4th at p. 613; *People v. Bonilla, supra,* 41 Cal.4th at pp. 341–342; *People v. Burgener* (2003) 29 Cal.4th 833, 864 [129 Cal.Rptr.2d 747, 62 P.3d 1].) In *Lenix,* our Supreme Court held: " '[T]he trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie " 'peculiarly within a trial judge's province,' " [citations], and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]." [Citation.]' [Citation.]" (*People v. Lenix, supra,* 44 Cal.4th at p. 614, quoting *Hernandez v. New York* (1991) 500 U.S. 352, 364–365 [114 L.Ed.2d 395, 111 S.Ct. 1859]; *Snyder v. Louisiana* (2008) 552 U.S. 472, 477–478 [170 L.Ed.2d 175, 128 S.Ct. 1203]; see also *Thaler v. Haynes* (2010) 559 U.S. ___, ___ [175 L.Ed.2d 1003, 130 S.Ct. 1171, 1174].)

■ As discussed previously, we give great deference to the trial court's denial of a motion premised upon the improper use of a peremptory challenge. (*People v. Lenix, supra,* 44 Cal.4th at pp. 613–614 [" 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.]' "]; *People v. Bonilla, supra,* 41 Cal.4th at p. 341; *People v. Avila, supra,* 38 Cal.4th at p. 541.) Our Supreme Court has held: " ' "All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." [Citation.] A reason that makes no sense is nonetheless "sincere and legitimate" as long as it does not deny equal protection. [Citation.]' [Citation.]" (*People v. Cruz, supra,* 44 Cal.4th at p. 655, quoting *People v. Reynoso* (2003) 31 Cal.4th 903, 919, 924 [3 Cal.Rptr.3d 769, 74 P.3d 852], and *People v. Guerra* (2006) 37 Cal.4th 1067, 1100–1101 [40

Cal.Rptr.3d 118, 129 P.3d 321], overruled on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151 [74 Cal.Rptr.3d 454, 180 P.3d 224].) And often, the best evidence of a prosecutor's intent in exercising a peremptory challenge is his or her demeanor when explaining why a prospective juror was excused. (*Thaler v. Haynes, supra*, 559 U.S. at p. ___ [130 S.Ct. at p. 1175]; *Hernandez v. New York, supra*, 500 U.S. at p. 365 (plur. opn. of Kennedy, J.).)

### 3. First motion

#### a. Overview

The first motion was made by Mr. Higgins, counsel for Mr. Jones, after the prosecutor had exercised six peremptory challenges. Mr. Higgins argued "We see a pattern of the excusing of [African-Americans] from this jury." Counsel for Mr. Jackson, Ms. Trotter, joined the motion, noting there was one African-American seated on the jury and one remaining in the pool of prospective jurors. The trial court found a prima facie case and requested an explanation from the prosecutor for the challenges. Thereafter, the trial court, in denying the motion explained: "[B]ased upon what the People are saying, these people were excused for nonracial or race neutral reasons, whether the defense agrees or not." When Mr. Higgins argued that the prosecutor's reasons did not "cut it," the trial court explained: "Well, there seems to be confusion how we define these motions. The ideal juror, it seems to the court, other than those who have no proof for cause, they're not, quote, unquote, 'ideal,' they get excused for a number of reasons, but the court's standpoint, they are ideal because they were not excused for cause. There are reasons why they're excused. How counsel view witnesses and their case from the standpoint of Wheeler [Batson] Johnson, we're talking about people being excused based upon a racial matter or ethnicity and [peremptory] challenges allow lawyers to excuse for any reason they want to, they can. Fat, bad breath or bad personalities, any number of reasons, as long as it's not based on race. It's allowed on both sides. And it seems to the court, based upon what the People are saying, these people were excused for nonracial or race neutral reasons, whether the defense agrees or not. It's not the issue. [¶] The issue is if the court believes they were excused for something other than race, it basically does not violate Wheeler [Batson] Johnson. The People made an argument, race neutral, whether the defense believes it or not. They're ideal, several that defense excused, we're not dealing with ideal whether the exclusion is race neutral, that's the Wheeler [Batson] Johnson standard. [¶] Also, we get into this confusion why people have been excused. If either side can document and articulate the reasons are race neutral, there's no basis to grant the motion. In this case, whether anyone agrees with it or not, the reasons are race neutral. Based on that, the court will deny the motion. [¶] I

will add, I keep score, everybody who is excused. I delineate their ethnicity. At this point the People have excused six people, three Black men and three Latino males. The defense has excused two Latinos and a Middle Eastern woman and the rest white men. I keep score. I know exactly who is excused and what their race is at all times. I'm saying anytime we do a Wheeler, I have a breakdown of everyone excused." When counsel for Mr. Jones, Mr. Higgins, inquired about the trial court's reasons for making a comparison of those excluded, the trial court explained: "This is not a comparison. It has nothing to do with statistics, but this bench officer. It's imperative jurors are treated fairly by the lawyers, and the court should be apprised of everybody who is excused and their ethnicity and keep an indication, just like the defense makes notes indicating why certain people are excused. It there is, in fact, a Wheeler motion, the court feels it should do the same thing, that's the court's practice. The court has always done that. Each and every juror excused, I keep notes so if I have to deal with a Wheeler [Batson] Johnson motion. I have the same notes counsel makes. There's no law says only the lawyers keep notes. I think it makes you a better judge, and you basically have a handle on jurors and a Wheeler [Batson] Johnson motion. That's been my practice and it will continue to be my practice."

Thereafter, Ms. Trotter, counsel for Mr. Jackson, indicated the trial court should "look behind what was said in order to determine" whether there was a racial basis for the peremptory challenge. The trial court inquired, "How do you look behind what was said?" Ms. Trotter responded, "By using your common sense based on the nature of the case, the nature of the people that are excused and the nature and ethnicity of the people that are excused." The trial court answered: "The problem with using common sense is that is subjective, that basically changes from motion to motion. So the court—that's what the lawyers, you use objective. When the court starts doing it from a common sense and a subjective standpoint, the court is violating the law and the court can be accused of playing favoritism. It says we're supposed to grant motions. I have granted motions if it was based upon race. I'm not going to use my common sense. Common sense, different people have different perceptions of what common sense means. I will never use that standard." Mr. Higgins inquired, "Is the court saying it will only grant a Wheeler if a prosecutor or a defense comes in chambers and says he excused a person because of race?" The trial court responded: "I haven't said that, nor will I make a statement like that. I made my ruling."

### b. Prospective Juror No. 6300

During voir dire, the first juror in question, Prospective Juror No. 6300, an African-American, indicated that he was a 65-year-old retired truckdriver with six children. He lived in "South Central" and said all of his children

work. One of his sons worked for a law firm in Los Angeles. Juror No. 6300 indicated that when he lived in Alabama, he could not talk. Ms. Trotter asked, "Now, if you're selected as a juror in this case, you're going to be required to talk. Is that going to cause you to have a problem?" Juror No. 6300 responded, "Yes." Ms. Trotter then inquired, "You don't like dealing with people and talking to other people about yourself; is that right?" Juror No. 6300 responded, "That's correct." Ms. Trotter continued: "And, you know, then since you know you would have to talk, you really couldn't be fair then in this case, could you?" Juror No. 6300 responded, "That's right." Ms. Trotter noted, "And I take it by your body language you really don't want to be here." Juror No. 6300 answered, "That's the truth." Later, the trial court inquired: "Juror [No. 6300], you don't want to be here." Juror No. 6300 answered, "No, sir." Juror No. 6300 was asked if he was selected for the jury and heard all the evidence would he change his mind if other jurors felt differently than he did. Juror No. 6300 responded: "Everyone have their own mind. No, I wouldn't." Mr. Higgins asked, "But even though you might not talk a lot, could you express your opinion to the other people back there and tell them how you felt?" Juror No. 6300 answered, "Everyone have their own mind, so you can't change nobody, so I wouldn't try to change the individuals because they have—" Mr. Higgins interjected: "My question is could you tell them why you felt that way? You don't necessarily have to change their mind, but could you tell them why you felt that way?" Juror No. 6300 answered: "No, I wouldn't. I wouldn't think I would have to do anything like that, no, I wouldn't."

During a subsequent sidebar discussion regarding challenges for cause, Ms. Trotter indicated that she had initially considered excusing Prospective Juror No. 6300, but was "reconsidering." Ms. Trotter noted that Juror No. 6300 was late because of an emergency. Ms. Trotter presumed by his appearance that the emergency was related to his health. The trial court noted that Juror No. 6300 had been very guarded about the emergency. The prosecutor then indicated that Juror No. 6300 stated, "I am 65 . . . things are hard to remember." The prosecutor also noted that Juror No. 6300 did not want to be on the jury or deliberate and would not speak up during deliberations. The trial court denied the motion for cause. Thereafter, the prosecutor excused Juror No. 6300 as her first peremptory challenge.

 Following the trial court's prima facie finding, the prosecutor explained she had dismissed Prospective Juror No. 6300 because he stated it was hard for him to remember; said he was not allowed to talk when he lived in Alabama; "viewed himself as being someone who would not like to engage in a dialogue, should he be chosen to deliberate"; was soft spoken; said he really did not like to talk; and did not want to be there. The prosecutor added: "I don't believe he would be a fair participant when the attitude that he had put forth during the questioning of all the jurors is one that he didn't want to

participate. It's too serious, and when they voice the fact they don't want to participate when questioned, then I excused him for those reasons." Our Supreme Court has held that even where a prima facie case has been shown: "The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. [Citations.] The explanations need not justify a challenge for cause. [Citation.] 'Jurors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.]' [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122 [124 Cal.Rptr.2d 373, 52 P.3d 572]; see *People v. Box* (2000) 23 Cal.4th 1153, 1186, fn. 6 [99 Cal.Rptr.2d 69, 5 P.3d 130], overruled on a different point in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10 [105 Cal.Rptr.3d 131, 224 P.3d 877]; *People v. Turner* (1994) 8 Cal.4th 137, 165 [32 Cal.Rptr.2d 762, 878 P.2d 521]; see also *Purkett v. Elem* (1995) 514 U.S. 765, 767–768 [131 L.Ed.2d 834, 115 S.Ct. 1769].) ▮ Moreover, our Supreme Court has held that a juror's unwillingness to interact with other jurors is a valid reason for a peremptory challenge. (*People v. Mills, supra*, 48 Cal.4th at p. 184; *People v. Watson* (2008) 43 Cal.4th 652, 681 [76 Cal.Rptr.3d 208, 182 P.3d 543] [peremptory challenge supported by relevant race-neutral concerns where a juror appears too stubborn or opinionated to appropriately participate in jury deliberations]; see also *People v. Yeoman* (2003) 31 Cal.4th 93, 116 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) It was apparent that even Ms. Trotter considered Juror No. 6300 a possible candidate for a challenge for cause based upon his responses. The expressed unwillingness of Juror No. 6300 to participate in jury deliberations constituted substantial evidence that the prosecutor exercised a permissible race-neutral reason for his excusal, thereby supporting the trial court's ruling.

### c. Prospective Juror No. 6469

Prospective Juror No. 6469 was a single African-American man. Juror No. 6469 reported that he was a retired psychiatric social worker and a resident of Carson. He had previously served on four juries that reached verdicts. Juror No. 6469 had done clinical work and hospitalization assessments for Los Angeles County and managed a program that authorized "state hospital and funding." The brother of Juror No. 6469 was Judge Craig Veals. Juror No. 6469 did not discuss cases with Judge Veals because they "have a difference of opinion" over such matters. Juror No. 6469 indicated he would not have a problem being fair in this case. The prosecutor removed Juror No. 6469 by peremptory challenge.

▮ Following the motion, the prosecutor explained that she excused Prospective Juror No. 6469 because she had tried cases before Judge Veals. The prosecutor said she would be distracted by having Judge Veal's brother

on the jury. Additionally, the deputy district attorney said: "He said when you asked, when your Honor asked him about his brother, does he talk about cases, juror 6469 said, 'We have different opinions about things so we don't talk about cases.' That gave me a bit of pause because I know that Craig Veals was a prosecutor prior to the time that he took the bench." Finally, Juror No. 6469's employment as a psychiatric social worker led her to believe that he might express sympathy toward young individuals when they have been charged with a crime. Our Supreme Court has held that a prosecutor could reasonably exercise a peremptory challenge against a social worker. (*People v. Watson, supra*, 43 Cal.4th at p. 677; see also *People v. Lewis* (2008) 43 Cal.4th 415, 476–477 [75 Cal.Rptr.3d 588, 181 P.3d 947] [parole agent with a psychology degree]; *People v. Landry* (1996) 49 Cal.App.4th 785, 790–791 [56 Cal.Rptr.2d 824] [juror's background in psychiatry].) In addition, Juror No. 6469's brother was a judge and former prosecutor. Their disagreements were so profound they could not even discuss cases. As noted previously, the exercise of a peremptory challenge may be based upon a prosecutor's "hunch" if shown to be race neutral. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1122; *People v. Box, supra*, 23 Cal.4th at p. 1186, fn. 6.) Substantial evidence supports the trial court's determination that the prosecutor's reasoning was race neutral.

### d. Prospective Juror No. 2037

Prospective Juror No. 2037, an African-American man, indicated that he grew up in Compton and had some relatives who belonged to gangs. When asked if he was a member of a gang, Juror No. 2037 responded, "Not necessarily." Juror No. 2037 was familiar with the local gang and knew some members of the local gang when he was 12 or 13 years old. When asked if that would cause him a problem with being fair in this case, he answered, "No." When asked how he avoided joining a gang, Juror No. 2037 said he was "academically smart" and got interested in other things which pointed him in a different direction. His ex-wife was studying for the bar exam. The prosecutor excused Juror No. 2037 with her sixth peremptory challenge.

In explaining her reasons for excusing Prospective Juror No. 2037, the prosecutor initially explained: "[H]e indicated his ex-wife was sitting for the bar. That caused me concern because I didn't have an opportunity to question him about feelings he may have had about attorneys, but it's his ex-wife." In addition, the prosecutor exercised the peremptory challenge because Juror No. 2037: grew up with gangs in Compton; had relatives who were gang members; knew about the local gang members; and he had "[run] with and associated with other gang members who are of the same gang as the defendants charged in this matter . . . ." The prosecutor indicated that she had not had an opportunity to question Juror No. 2037 further about sitting as

a juror in a local gang case where he might still know individuals involved in that gang. In *People v. Watson, supra,* 43 Cal.4th at pages 679–680, our Supreme Court held that contacts with members of street gangs where the prospective juror lived provided support for the prosecutor's bias concerns. Juror No. 2037 not only knew about the local gang, but grew up with members of that gang and "ran with them" when he was 12 or 13. Substantial evidence supports the trial court's finding the exercise of the peremptory challenge at issue was a race-neutral decision by the prosecutor.

### 4. Second motion

#### a. Overview

The second motion was again made by Mr. Higgins on behalf of Mr. Jones after the prosecutor excused Prospective Juror No. 3348, an African-American woman. Mr. Higgins argued that the prosecutor had now excused five African-American jurors. The trial court found a prima facie case had been demonstrated, noting that another juror who knew the family of one of the defendant's parents had also been excused by the prosecutor. The trial court denied the second motion, satisfied the reasons given were race neutral. After finding each peremptory challenge race neutral and discussing each individually, the trial court noted: "Now, I can't psychoanalyze any lawyer as to the basis why they kick anybody. And that the—if the issue presented suggested that this is [race neutral], then the court has to basically make a determination based upon it, unless there is some other factors that suggest that that person is basically excusing people based upon racial matters. But I have not heard anything yet that has suggested that. So unless and until I do, it is basically—I can't make a finding based upon the fact that people are excused because of that. If that happens, court will make a determination. And I can't just use common sense or just surmise that because 'X' number of individuals are excused based upon that ethnicity, that that means they are being excused for racist reasons, I don't necessarily believe that. But nevertheless the law says that anybody who basically has to respond to a Wheeler/Batson/Johnson motion, has to give reasons. If the reasons appear to be [race neutral], then the court [basically] has to accept it at face value, unless there is something else presented that basically, is factual, not surmising by one or more lawyers. So that's basically the basis of this particular motion. [¶] And I would suggest that I assume each and every time, although, I guess, I'm kind of predicting, but I guess each and every time one or two African-Americans is excused, we are going to have Wheeler/Batson/Johnson motions, which is fine with the court. I don't have any problem with that. [¶] As it stands now—I indicated last week that I keep track of every ethnicity, both People as well as defense. As of now, the ·People have excused 11 people, five African-Americans, six Latinos. The defense has excused four

Latinos. One, [believed] to be an Indian from India, as opposed to two white men. And Mr. Higgins has excused one Latina. So there has been five by the defense and six for the People. This first panel pretty much is Latino. It seems to the court the number of Latinas seem to have been a large portion than of the other races. [¶] So that is where we are at this particular time. So, again, the court does keep up with not only the ethnicity, but also the questions and responses of all of the jurors."

### b. Prospective Juror No. 3348

Prospective Juror No. 3348, an African-American woman, indicated that she lived in Carson, was married and had five children. She was a dispatch supervisor for a delivery company. She had never served on a jury. Juror No. 3348 later reported that her father had been in prison for approximately 10 years following his conviction "for drugs." She indicated that would not make it difficult for her to be a juror in this case. The prosecutor excused Juror No. 3348. This was the prosecutor's 11th peremptory challenge.

In explaining why a peremptory challenge was exercised as to Prospective Juror No. 3348 the prosecutor stated: "First . . . , the responses to the court's questions . . . [s]he did not provide any affirmative responses to any of those. So I feel as if I got very little information from her." The prosecutor further explained: "[M]ost significantly, your Honor, she told us she presently has a brother [sic] who is incarcerated in jail. . . . [I]t has been my experience as a Deputy District Attorney that there are times when people have experiences with law enforcement or people incarcerated that are not always brought up in questioning. . . . [I]t has been my experience that when someone has a relative [who] is currently in jail, presumably put there by a Deputy District Attorney through a criminal proceeding, that that juror may be disinclined to be a fair juror for the People . . . ." These are race-neutral justifications for this exercise of a peremptory challenge. (*People v. Roldan* (2005) 35 Cal.4th 646, 703 [27 Cal.Rptr.3d 360, 110 P.3d 289], overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1690 [43 Cal.Rptr.2d 129]; see also *People v. Watson, supra*, 43 Cal.4th at p. 678; *People v. Farnam* (2002) 28 Cal.4th 107, 138 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

### c. Prospective Juror No. 8289

Prospective Juror No. 8289, an African-American woman, stated that she was married and had six children. She worked as a court services assistant for Los Angeles County Superior Court. Juror No. 8289 recognized someone in the audience named Emma Beverly. Ms. Beverly was a friend of Juror

No. 8289's sister. Juror No. 8289 had seen Ms. Beverly at a funeral some six years prior. Juror No. 8289 had been raised in Compton, but left when she was about 16 years old. Juror No. 8289 spoke to Ms. Beverly in the elevator and inquired, "Aren't you a Bellow?" Ms. Beverly responded, "Yes . . . I recognize you as a Jones." Juror No. 8289 responded: "I am a Jones. I used to live on the corner [in the area of the local gang]." Juror No. 8289 asked, "How's your sister?" Ms. Beverly answered, "She's dead." Juror No. 8289 later saw Ms. Cox smile at Ms. Beverly as she entered the courtroom. In response to further questioning by the court, Juror No. 8289 acknowledged that she had cousins who are associated with the gangs but did not know which side they were on. Juror No. 8289 indicated that the conversation in the elevator would not affect her ability to be fair in this case. Thereafter, the prosecutor moved to excuse Juror No. 8289 for cause based on the information provided. The prosecutor noted that Juror No. 8289 had approached someone and initiated a conversation despite the fact that the jurors had been advised not to speak to anyone. The trial court denied the motion. Thereafter, the prosecutor exercised her seventh peremptory challenge to excuse Juror No. 8289.

In explaining her peremptory challenge, the prosecutor stated: "I would restate my reasons that I did when I made a challenge for cause. The fact that this juror came forward and told the court and counsel that she had had contact with someone is admirable, however, it concerns me that she—that a prospective juror had a relationship with the Cox/Bellows family. There are going to be these individuals in court on a regular basis supporting [Ms.] Cox, who is a defendant in this case, with three others. It is my position that the potential for some sort of contact again or potential bias makes— made that juror rather better suited to some other case where she doesn't have a connection or knowledge with family members that she grew up with in the defendant's family. Not to mention that one of the defendant's family spoke to her. And I believe that that would be a potential for improper influence, perhaps fear, perhaps reluctance to return a verdict, to find her guilty or not guilty." The prosecutor could reasonably be concerned that Prospective Juror No. 8289 came forward to report an encounter with a family member of Ms. Cox. Further, the prosecutor could reasonably conclude Juror No. 8289's judgment might be influenced by a familiarity with not only Ms. Beverly but other family members who might appear in court or by Ms. Cox. On this record, substantial evidence supports the trial court's ruling on the second motion.

## 5. Third motion

### a. Overview

The third motion was again made by Mr. Higgins, who argued that the prosecutor had excused two African-American women. Mr. Higgins acknowledged that Prospective Juror No. 0342 did have "some issues and problems" with her friend's children. After finding a prima facie showing had been made, the trial court denied the motion to discharge the panel. After hearing the prosecutor's reasons for excusing two more African-American prospective jurors and the arguments of defense counsel, the trial court denied the motion. In denying the motion, the trial court noted: "I don't see anything. I am just kind of curious. The defense excused Juror No. 4, Black male who seemed to be, basically, identical in terms of the issues that the defense is alleging with respect to excusing Juror No[s]. 2 and 4. He seemed to be the ideal juror, just based on what the court heard, although the court is not selecting the jurors. I think the same thing that applies to these arguments why the people should not be excused, as to [Juror Nos.] 2 and 4, seems to the court to apply to Juror No. 4, as well. I don't see why when he said that he couldn't be fair and impartial. In fact, I thought he was remarkable, but, you know, certainly that is why we have peremptory challenges. [¶] I am not attacking that. I am only suggesting that it seems to be the same argument being made as to [Juror Nos.] 2 and 4 and the reason why they, basically, should not be allowed to sit would be the same reason that [applies] to Juror No. 4, Black male that was excused [by the defense]."

### b. Prospective Juror No. 8871

Prospective Juror No. 8871 was a single African-American woman. She worked as a coach bus driver for the Orange County Transportation Authority. She had never served on a jury. Juror No. 8871's father had been killed by a drunk hit-and-run driver in Compton 15 years earlier. No one was ever prosecuted for the crime. Juror No. 8871 stated that she would not hold the fact that no one had been prosecuted against anyone in this trial although she felt the "system" let her family down. Juror No. 8871 had a previous boyfriend who was arrested on a drug charge and a nephew who was arrested and was incarcerated. The nephew had been tried in the Compton courthouse. The same nephew, who used crack cocaine, had been arrested again the weekend prior to the voir dire questioning. Juror No. 8871 said that nothing about those cases would cause her a problem in this case.

The stated reasons were race neutral. Prospective Juror No. 8871 had indicated the system let her family down because no one was prosecuted for her father's death. In addition, Juror No. 8871's nephew was prosecuted in

the Compton court and was recently arrested again. As noted, the fact that a prospective juror's family member is either incarcerated or undergoing prosecution is a valid reason to exercise a peremptory challenge. (*People v. Roldan, supra,* 35 Cal.4th at p. 703; *People v. Watson, supra,* 43 Cal.4th at p. 678; *People v. Farnam, supra,* 28 Cal.4th at p. 138.)

### c. Prospective Juror No. 0342

Prospective Juror No. 0342 was a single African-American woman and mother of a three-year-old child, who lived in North Long Beach. She worked as a truck unloader at Target on the graveyard shift. She had been an alternate juror on a jury once before that reached a verdict. Approximately 20 years earlier, Juror No. 0342 had been the victim of an armed bank robbery when she worked as a teller. The robber had never been apprehended. In 2001, Juror No. 0342 also had a good friend who was stabbed 15 times. His assailants had tried to decapitate him, but he survived. No one was apprehended for the crime. In addition, a girlfriend of Juror No. 0342 lost two of her sons in gang-related shootings in Compton in the years 2000 and 2004. The local gang was implicated in the shootings. Juror No. 0342 grew up in Compton but felt that these circumstances would not cause her to be unfair. Juror No. 0342 felt that she could listen to the case and be fair to all parties "based upon the facts." Finally, the father of her child had been arrested numerous times. The arrests were for drugs, gangs and child molestation. The father had been arrested throughout his life. Juror No. 0342 had not known about his past until after she was pregnant. Juror No. 0342 no longer had contact with the father of her child. When asked whether she could be fair given the fact the father of her child rarely came by, Juror No. 0342 smiled. The following occurred: "The court: Anything about that would cause you to have problem being fair in this case? [¶] You are smiling at me. What does that tell us? [¶] [Juror No. 0342]: I would be fair judging based—[¶] The court: So why are you smiling? [¶] [Juror No. 0342]: Because he is a whole different category. What I know him, he is a whole different other fact, whole other thing. I don't know these folks or anything about them or their past or nothing like that." Again while discussing the father with the extensive criminal record, the following occurred: "The court: The concern I have, would that somehow . . . spill over into how you feel about some other people involved in this case? You might take—because you couldn't get your baby daddy. [¶] [Juror No. 0342]: I would hope not. [¶] The court: You don't want to. You hope not? [¶] [Juror No. 0342]: I am answering truthfully. I would say right now I am saying no." Juror No. 0342 indicated: "So I have to say, truthfully, I mean I will not be biased or try to be prejudiced or anything toward any of them. [¶] . . . [¶] Put all that past, and do what I have to do." The prosecutor's 15th peremptory challenge was utilized to excuse Juror No. 0342.

The prosecutor explained: Prospective Juror No. 0342 had been held up at gunpoint while employed as a teller; had a friend who was nearly decapitated and stabbed 15 times in 2001; had a good friend whose two sons were murdered as a result of gang violence in Compton; and the father of her daughter had been in jail, on parole and was currently incarcerated due to child molestation charges. The prosecutor noted that the murder in this case occurred in 2003 in the same area where the sons of Juror No. 0342's friend were killed in the years 2000 and 2004. Juror No. 0342's life experiences and hesitation in responding that she could be unbiased could reasonably be considered prejudicial to the prosecution. These race-neutral reasons provide substantial evidence to justify the trial court's ruling on the third motion.

### 6. Fourth motion

#### a. Overview

Ms. Trotter, counsel for Mr. Jackson, made the fourth motion following the prosecutor's exercise of her 18th peremptory challenge to excuse Prospective Juror No. 6223. The trial court found a prima facie case had been established, directed the prosecutor to explain her rationale for excusing Juror No. 6223 and subsequently denied the motion. In denying the motion, the trial court explained: "As I indicated last week, with respect to peremptory challenge, it is based upon some particular reason that the lawyers feel that they don't want to pick the person on their particular jury, a number of factors, as long as it is [race neutral]. Now we have exercised about 31, 32 peremptory challenges among the five of you, probably of the 32 jurors excused, a good 29, 28 have all said they could be fair, all could be impartial, all could listen to the evidence, but for some reason or another they were excused based upon some [race-neutral] premise. It just seems to me that certain jurors are subject, certain jurors, result—and there have been Wheeler/Batson/Johnson motions when a particular side doesn't particularly care why certain people were excused, based upon what they believe to be ethnic reasons. But I would say, other than three jurors who have been excused, everybody said they could be fair and impartial, objective, open-minded, articulate, interested, wanted to serve, but they were excused. And they were just as worthy of serving as some of the people who have been the subject of this Wheeler/Batson motion. [¶] So I just still don't, you know, ask counsel and [reiterate] that, you know, these arguments that you make as to why certain people should not be excused as they apply to a lot of people, but those people are not the subject of the Wheeler/Batson motion for a number of reasons. [¶] I just point out, I have no problems with these motions, but seems that each side is able to couch and justify why they excuse people peremptorily and has nothing to do with race or race matters. So I just throw that out for counsel. I have no problems. I am not trying to discourage these

motions, but my only suggestion is that most of the people that we excuse seem to be fair jurors, at least in the court's eyes. But I understand you are advocates, you are looking for a certain person for certain reasons, but the answers that you have given as to why certain are excused that apply to other folks who are not the subject of these motions, too."

Thereafter, Mr. Higgins asked the court to "look behind these reasons to see whether" the peremptory challenge exercised against Prospective Juror No. 6223 was actually justified. When the trial court asked for clarification, Mr. Higgins responded: "Don't just take it at face value. I don't think you can take it simply at face value. You look at it, you look at the pattern that has been going on and if it doesn't necessarily fit, and if we have jury such as just been excused, who has no particular problem, other than this unfortunate incident that happened in the life of her husband, I think that the court has a duty to look behind that to see whether or not there is really a pattern of discrimination based on race." The trial court responded: "Well, you are asking me to read somebody's mind, which I can't do. I don't think the law even allows or provides for the court to do that. But I still indicate there are other people who have been excused, the court feels were fit and proper subjects and fit and proper jurors, but they were excused for any number of reasons, based upon some [predilection] or strategy of the lawyer, but they are not the subject of <u>Wheeler/Batson/Johnson</u> motion. But the court can look behind that and make certain assumptions. [¶] I think you are asking the court to be a mind reader. I don't think that is fair to any side. I mean, if you want to excuse a particular person, that is your right, because you are an advocate and you want the best jurors for your clients. So I am not about to do that. [¶] Plus, I don't think I need to qualify and even capable of acting in some sort of psychiatric or sociological decision to make these findings. Only the court—and the law has provided these motions, I hear these motions, entertain them. I think there is good cause, I grant them. If not, I will deny them."

### b. Prospective Juror No. 6223

Prospective Juror No. 6223 was a married African-American woman who lived in Harbor City and worked for the Los Angeles Department of Water and Power. She had previously served on a jury involving a murder. The jury reached a verdict. Someone stole Juror No. 6223's rims and tires from her car. In 1990, Juror No. 6223 was present at her uncle's restaurant in Compton when two individuals robbed the owner and patrons. Juror No. 6223's husband was arrested by an off-duty police officer at a Jordan High School football game. Her husband and others were asked to sit down. Her husband and the officer "went tumbling down the stands" and a fight erupted. Her husband was ultimately charged with misdemeanor disturbing the peace.

When asked by the trial court whether she thought her husband was treated fairly, Juror No. 6223 hesitated. She then responded, "[The off-duty police officer] should have identified himself, I feel, you know, maybe things would have went differently." Juror No. 6223 did not feel she would be biased against the authorities in this case as a result of that experience. Juror No. 6223 had heard of the local gang but did not know anything about them.

The prosecutor explained her reasons for exercising this peremptory challenge as follows. Prospective Juror No. 6223's husband had been arrested at the football game during which he got into a fight. The fight was with a peace officer. When the trial court inquired whether she felt her husband was treated fairly, she hesitated. The trial court had also inquired about her hesitation when she was asked if she felt her husband was treated fairly. Juror No. 6223 had responded that the police officer should have identified himself as an off-duty police officer. The prosecutor stated, "And the facial expression that she had led me to believe that she was hesitating because she didn't believe her husband was treated fairly." The prosecutor stated, "She indicated that she thought that the police officer should have divulged [he was a police officer] or provided the information." And the prosecutor noted: "[T]he credibility of police officers, as with any witness, is always at issue in any trial when the jurors are asked to determine the truthfulness of a person's account. And, in this case, I don't want to have a juror who is in a situation where some experience such as she articulated involving her husband would in some way improperly influence her ability to evaluate the testimony of police officers. And on that basis I excused her." Here, Juror No. 6223 believed her husband's prosecution was tainted by the off-duty officer's failure to identify himself. The prosecutor could reasonably assume that Juror No. 6223 would be prejudiced against the prosecution and the credibility of testifying officers. This race-neutral reason was substantial evidence which supports the trial court's ruling on the fourth motion.

### 7. Fifth Motion

#### a. Overview

Mr. Higgins made a fifth motion following the prosecutor's dismissal of Prospective Juror No. 7898. This was the prosecutor's 19th peremptory challenge. The trial court found a prima facie case had been demonstrated and later denied Mr. Higgins's motion. After defense counsel objected to the prosecutor's exercise of the peremptory challenge as to Juror No. 7898, the trial court found a prima facie case had been demonstrated. The prosecutor then explained her reasoning in dismissing Juror No. 7898. The trial court denied the motion, noting only, "Court finds it is neutral."

### b. Prospective Juror No. 7898

Prospective Juror No. 7898 was an African-American single mother who lived in Compton. She worked as a wage garnishment representative for Automatic Data Processing. She had no experience as a juror. Juror No. 7898 had friends and neighbors who had been arrested for possession of narcotics for sale and for marijuana on more than one occasion. Two of her friends were in jail at the time of this trial. Juror No. 7898 said that would not cause a problem for her to be fair in this case. Juror No. 7898 said that she had held one of her friend's guns and looked at it. When asked if she had any history of gangs, Juror No. 7898 responded: "Yeah. Friends. Friends, classmates. I live in the city of Compton, so I know a lot of them." Thereafter, Juror No. 7898 named several gangs including the local gang to which defendants belonged. Juror No. 7898 said that her knowledge of gangs would not cause a problem in being fair in this case. Juror No. 7898 denied being a gang member.

The prosecutor explained that when Prospective Juror No. 7898 was seated in the jury box that morning, Mr. Jackson nudged Mr. Johnson. Mr. Jackson then pointed toward Juror No. 7898. In addition, Juror No. 7898 had indicated that she had several friends who were neighbors who were involved in gangs. Juror No. 7898 also reported that she had held a friend's gun. Juror No. 7898's familiarity with the gangs in her area and her possible affiliation with the defendants were race-neutral reasons for excusing her. As a result, substantial evidence supports the trial court's ruling on the fifth motion.

### 8. Comparative analysis

### a. Controlling authority

Defendants argue that a comparative analysis of the prospective jurors for whom the prosecutor exercised peremptory challenges with those that remained on the jury suggests "purposeful discrimination" against prospective African-American jurors. In the case of *Miller-El v. Dretke* (2005) 545 U.S. 231, 236 [162 L.Ed.2d 196, 125 S.Ct. 2317], the United States Supreme Court held that an appellate court should determine whether the reasons given for the prosecution's exercise of peremptory challenges were equally applied to other jurors. (See also *People v. Lenix, supra,* 44 Cal.4th at p. 613; *People v. Gray* (2005) 37 Cal.4th 168, 188–189 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

In *People v. Lenix, supra,* 44 Cal.4th at page 622, our Supreme Court held: "*Miller-El II, supra,* 545 U.S. 231, and *Snyder* [*v. Louisiana, supra,* 552 U.S. 472] demonstrate that comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue

of intentional discrimination. These cases stand for the proposition that, as to claims of error at *Wheeler/Batson*'s third stage, our former practice of declining to engage in comparative juror analysis for the first time on appeal unduly restricts review based on the entire record. As the high court noted in *Snyder*, 'In *Miller-El* v. *Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity *must* be consulted.' (*Snyder*, at p. [477] . . . , italics added.) Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons. [¶] Nevertheless, like the *Snyder* court, we are mindful that comparative juror analysis on a cold appellate record has inherent limitations. (See *Snyder, supra,* 552 U.S. at [pp. 483–484] . . . .) Experienced trial lawyers recognize what has been borne out by common experience over the centuries. There is more to human communication than mere linguistic content. On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact. 'Even an inflection in the voice can make a difference in the meaning. The sentence, "She never said she missed him," is susceptible of six different meanings, depending on which word is empha-sized.' [Citation.] '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record.' (*Reynolds v. United States* (1878) 98 U.S. 145, 156–157 [25 L.Ed. 244].)" (Fn. omitted; see also *People v. Mills, supra,* 48 Cal.4th at p. 177.) In *Miller-El v. Dretke, supra,* 545 U.S. at pages 240–241, the Supreme Court had the benefit of knowing the ethnicity of the jury venire as well as those jurors ultimately selected to serve on the jury. The Supreme Court had the jurors' pretrial questionnaires for purposes of comparison. As noted, we have no evidence as to the number of African-American jurors who actually deliberated and returned the ver-dicts. Nor do we have any evidence as to mixed-race jurors.

### b. Contacts with law enforcement

Defendants seek to compare the prosecutor's use of peremptory challenges to excuse Prospective Jurors Nos. 3348, 8871, 0342 and 6223 as a result of family contacts with law enforcement with her acceptance of Jurors Nos. 0541, 4257, 8970 and 1903, who allegedly had similar life experiences.

As previously discussed, Prospective Juror No. 3348 was excused because her brother was incarcerated. The prosecutor believed that Juror No. 3348 might be "disinclined to be a fair juror" for the prosecution. In addition, the

prosecutor noted Juror No. 3348 was very quiet during voir dire. This additional factor could reasonably lead the prosecutor to believe that Juror No. 3348 was hesitant to discuss issues or any number of other factors that might influence the verdict. Prospective Juror No. 8871 was challenged because she reported she had a nephew who was arrested and prosecuted in the Compton courthouse two years earlier and was again in custody. While that may have been significant, she also stated that her father had been killed by a hit-and-run driver some 15 years earlier and no one had been prosecuted. These factors caused the prosecutor concern.

Prospective Juror No. 0342 was excused because her former boyfriend had been in jail, on parole and was incarcerated at the time of trial. The boyfriend was the father of Juror No. 0342's child. In addition, Juror No. 0342 was excused because she had been robbed at gunpoint 20 years earlier; a friend had been stabbed 15 times and nearly decapitated; and a friend's two sons were murdered as a result of gang violence in Compton. When confronted by the trial court about whether the father's extensive record would cause her a problem, at first she was unsure. Prospective Juror No. 6223 was excused because her husband had been arrested by an off-duty police officer. The arrest occurred in the physical presence of Juror No. 6223. Moreover, Juror No. 6223 hesitated when asked if her spouse was treated well by the criminal justice system. The prosecutor believed this might cause Juror No. 6223 to be biased against the detectives' testimony in this case.

In contrast, Juror No. 0541 reported her brother had stolen items from her parents, brothers, and sisters as a result of his drug problem 10 years earlier. Since that time, her brother was doing well, was working and caring for her father. Juror No. 4257 indicated he had "a couple" of cousins who had been in jail in Mexico 17 years earlier. He stated he had no problem as a result of that. Juror No. 8970 reported that her husband's cousin was in jail for assault and murder. Juror No. 8970 said she did not know how long he had been in custody, but learned from the newspaper, "[T]hey're keeping them in." She did not feel anything about that situation would cause her to be improperly influenced. Finally, Juror No. 1903 stated her cousin and a brother were incarcerated for drugs and alcohol. Juror No. 1903 indicated nothing about their circumstances would cause him to be improperly influenced.

As our Supreme Court noted in *People v. Lenix, supra*, 44 Cal.4th at page 631: "While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (See also *People v. Gray, supra*, 37 Cal.4th at pp. 190–191 [the prosecutor may have preferred not to strike the other jurors for other positive reasons that

suggested they would be a favorable juror for the prosecution].) As noted, the jurors who were excused for law enforcement related concerns also had other factors that were viewed as problematic to the prosecutor. These concerns could reasonably cause the prosecutor to distinguish between the two sets of jurors in question. (See *People v. Mills, supra*, 48 Cal.4th at p. 178.) Moreover, on the cold record before us, we do not have the ability to evaluate the prosecutor's and panelists' demeanor. Nor do we have the trial court's ability to " 'assess the plausibility' of the prosecutor's proffered reasons" for excusing the prospective jurors at issue. (*People v. Lenix, supra*, 44 Cal.4th at p. 625, quoting *Miller-El v. Dretke, supra*, 545 U.S. at p. 252; see *Snyder v. Louisiana, supra*, 552 U.S. at p. 477.)

To sum up, Jurors Nos. 0541, 4257, and 1903 all expressed confidence without hesitation in their abilities to impartially decide the case. When confronted by the trial court with whether she could be fair in part due to her former boyfriend's extensive record of criminality and incarceration, at first, Prospective Juror No. 0342 hesitated. Consistent with its constitutional obligation, the trial court could reasonably find the two sets of jurors were not "otherwise similar" as that term is used in *Miller-El v. Dretke, supra*, 545 U.S. at page 241 or "not really comparable" as discussed in *Snyder v. Louisiana, supra*, 552 U.S. at page 483. (See *Cook v. Lamarque* (9th Cir. 2010) 593 F.3d 810, 817; *People v. Hardy* (N.Y.App.Div. 2009) 61 A.D.3d 616 [877 N.Y.S.2d 329, 330] ["[T]here was no disparate treatment of comparable panelists."].)

c. Gang associations

Defendants argue that the prosecutor's dismissal of Prospective Jurors Nos. 2037 and 7898 because of their gang associations should be compared to Juror No. 9893, who was not African-American and had an ex-girlfriend whose brother was a member of a Latino gang. Mr. Jackson and Mr. Jones also indicate Prospective Juror No. 8320 "who is apparently not Black" stated that she had a former boyfriend who was a gang member. Defendants argue that Juror No. 8320 remained on the jury. (Ms. Cox references Juror No. 7879. However the record references she notes actually relate to the dismissal of Juror No. 7898 based upon her friendship with neighbors who were involved in gangs.) In fact, as Mr. Jones concedes, the superior court file reflects that Juror No. 8320 was not on the final jury panel.

Again, there were additional reasons for the exercise of peremptory challenges that differed from the case of Juror No. 9893. When asked if he was a member of a gang, Prospective Juror No. 2037 evasively responded, "Not necessarily." In addition, the prosecutor said the fact that Juror No. 2037's ex-wife was taking the bar exam was a matter of concern. When asked if she had any history with gangs, Prospective Juror No. 7898 responded:

"Yeah. Friends. Friends, classmates. I live in the city of Compton, so I know a lot of them." Juror No. 7898 named the gangs with which she was familiar, including the local gang. She had also held and examined a friend's gun. Unlike the jurors who were allowed to remain on the jury, Juror No. 7898's familiarity with the gangs was current and could easily have included defendants. This is in contrast to Juror No. 9893 whose ex-girlfriend's brother was a gang member. In any event, the subtle nuances of the prospective jurors' and the prosecutor's demeanor apparent to the trial court are not before us. Because there were other distinguishing reasons for the prosecutor's excusals, the defendants' comparative juror analysis does not further their discrimination claims.

### d. Other comparisons

Mr. Jackson, Mr. Jones, and Ms. Cox argue that Prospective Jurors Nos. 6300 and 3348 were excused for being soft-spoken and very quiet while Juror No. 0758 was "repeatedly prompted" to speak more loudly. When Juror No. 0758 responded to the first of the standard questions posed, she was asked to speak up by the trial court and counsel. Thereafter, she responded to several additional questions without difficulty. When the trial court later quizzed the jurors regarding their responsibilities, Juror No. 0758 readily volunteered correct answers. This demonstrated she had paid attention to the judge's preliminary instructions and would serve as a thoughtful juror. Juror No. 0758 readily indicated she would state her opinion during deliberations and could vote guilty for one defendant while voting not guilty for another. On the other hand, Juror No. 6300 indicated he did not want to talk, did not want to interact with other jurors during deliberation and would refuse to discuss his opinion with them. Juror No. 3348 answered the basic questions with short phrases. Even when she explained that her father was in prison, her answer was very brief. As discussed earlier, the fact that Juror No. 3348's relative was incarcerated when coupled with her apparent reluctance to speak up constituted a race-neutral reason for the exercise of the peremptory challenge. By contrast, Juror No. 0758 was willing to express herself.

Mr. Jackson challenges the decision to excuse Judge Veals's brother. As noted, Prospective Juror No. 6469 did not speak to Judge Veals on some issues because they had differences of opinion. Mr. Jackson compares the decision to excuse Prospective Juror No. 8320, a "non-Black" woman who worked as a legal assistant. Juror No. 8320 had worked as a legal assistant in entertainment and corporate law firms. At the time of trial in this case, she was working in engineering and made transcriptions of in-house investigations for the California Highway Patrol on a part-time basis. There is no evidence Juror No. 8320 had ever worked in the criminal law field. Mr. Jackson also argues the prosecutor failed to challenge a "non-Black" male, Juror

No. 5207, who had two cousins who were lawyers. Juror No. 5207 stated one cousin was a patent attorney but was uncertain about the practice area of the other. Juror No. 5207 did not think either practiced criminal law. Neither of these jurors' answers suggested they would in any way be prejudiced. On the other hand, Juror No. 6469 did not speak with Judge Veals, a former prosecutor, because they had differences of opinion. This led the deputy district attorney to believe that Juror No. 6469 might be prejudiced against prosecutors since she knew Judge Veals had previously been one. In addition, Juror No. 6469 was a psychiatric social worker. These factors clearly distinguish him from the two jurors who ultimately served.

Ms. Cox argues that the prosecutor's dismissal of Prospective Juror No. 6469, a psychiatric social worker who might be sympathetic to young people, was inconsistent with the acceptance of Jurors Nos. 2159, a full-time musician, and 8970, a principal's assistant for the Los Angeles County Board of Education. However, as explained previously, when the other dismissal factors are coupled with Juror No. 6469's employment, they involve much more persuasive reasons for a race-neutral peremptory challenge. Neither Jurors Nos. 2159 and 8970 had differences of opinion with a former prosecutor who later became a judge.

Mr. Jackson argues that the prosecutor's reasons for dismissing Prospective Juror No. 7898 were insincere when compared to others who had experience with guns, including Jurors Nos. 3599, 9893, 4257 and 8970 who remained on the jury. Juror No. 3599 stated that she and her husband owned several guns, which they kept in a gun safe. Her husband collected guns and sometimes hunted and went to a range. Juror No. 9893 had gone to a shooting range for target practice "a couple times" but did not own any guns. Juror No. 4257 had used guns while in Mexico "a long time ago" to shoot birds, as well as for hunting and target practice. Juror No. 4257 had never owned a gun. Juror No. 8970 was married to a person who had served in the military. He taught her and their children how to shoot. Her husband still had guns, but they were in a safe. Juror No. 7898 reported that she had held and looked at a friend's gun. However, Juror No. 7898, knew "a lot of gang members"; knew about defendants' gang; and was acknowledged during jury selection by Mr. Jackson who nudged Mr. Johnson. Jurors Nos. 3599, 9893, 4257 and 8970 did not have what the prosecutor reasonably would have viewed to be Juror No. 7898's unusually extensive gang associations. Juror No. 7898 was not "otherwise similar" to the other jurors. (*Miller-El v. Dretke, supra*, 545 U.S. at p. 241; *Cook v. Lamarque, supra*, 593 F.3d at p. 817.)

### 9. The trial court complied with its prong three obligations

Defendants argue that the trial court failed to determine whether the prosecutor's proffered justifications for the peremptory challenges of nine

African-American jurors were so persuasive as to rebut the prima facie case of purposeful discrimination as required by the third prong of the *Batson* analysis. Defendants argue that the trial court merely acceded to the prosecutor's explanations given for her peremptory challenges in response to each of the five motions. We disagree.

The record demonstrates that over the six-day selection process, the trial court not only found a prima facie case as to each motion and thereafter heard the prosecutor's explanations for her peremptory challenges, but also assessed the "plausibility of the reasons" in light of all the pertinent evidence. (*Miller-El v. Dretke, supra*, 545 U.S. at p. 252; see *People v. Hamilton, supra*, 45 Cal.4th at p. 907.) Following the first defense motion, the trial court explained that both the prosecutor and defense attorneys may dismiss prospective jurors for any race-neutral reason. The trial court further noted, "The issue is if the court believes they were excused for something *other than race*, it basically does not violate Wheeler [Batson] Johnson." (Italics added.) The trial court continued: "In this case, whether anyone agrees with it or not, the reasons are race neutral. Based on that, the court will deny the motion." The trial court noted that it was keeping its own record of the race and ethnicity of each prospective juror that was excused, explaining, "I think it makes you a better judge, and you basically have a handle on jurors and a Wheeler [Batson] Johnson motion." This demonstrates that the trial court was paying close attention to not only those jurors subject to prosecutorial peremptory challenges but the proceedings as they related to those excused. The trial court further explained that, in the past, it had granted motions to discharge the jury panel when the peremptory challenges were based on race.

Following the second motion, the trial court further explained: "Now, I can't psychoanalyze any lawyer as to the basis why they kick anybody. And that the—if the issue presented suggested that this is race neutral, then the court has to basically make a determination based upon it, *unless there is some other factors that suggest that that person is basically excusing people based upon racial matters*. But I have not heard anything yet that has suggested that. So unless and until I do, it is basically—I can't make a finding based upon the fact that people are excused because of that. If that happens, court will make a determination." (Italics added.) Again, the trial court understood its duty to consider the plausibility of the reasons given by the prosecutor in light of all the evidence it has observed.

Following the fourth motion, the trial court reiterated that it could not be a "mind reader" regarding the peremptory challenges of specific jurors. The trial court explained: "Only the court—and the law has provided these motions, I hear these motions, entertain them. I think there is good cause, I grant them. If not, I will deny them." Inherent in that analysis is the trial

court's understanding that it need evaluate the peremptory challenges based upon its observations of the proceedings and grant the motion if there is an apparent race-related exercise of juror excusals. The trial court's reasoning following each motion not only supports the fact that it understood its obligation under the *Batson* third prong but also that it exercised its judgment in compliance with that part of the analysis. Moreover, the trial court unquestionably weighed the credibility of the prospective jurors and the prosecutor in denying the motions. This occurred after it considered the explanations given by the prosecutor as well as the voir dire of the prospective jurors. Deference to the trial court's findings is appropriate when the " ' "trial court ma[de] a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered" ' " by the prosecutor. (*People v. Mills, supra,* 48 Cal.4th at p. 175, quoting *People v. Lenix, supra,* 44 Cal.4th at p. 614; see also *People v. Hamilton, supra,* 45 Cal.4th at pp. 907–908; see *Thaler v. Haynes, supra,* 559 U.S. at p. ___ [130 S.Ct. at p. 1175] [where the reason for a peremptory challenge involves a juror's demeanor, the trial court's firsthand observations are significant]; *People v. Watson, supra,* 43 Cal.4th at pp. 670–671 [great deference is given to the trial court's ability to distinguish bona fide reasons from sham excuses]; *People v. Bonilla, supra,* 41 Cal.4th at p. 341.) There is no merit to defendants' argument that the trial court failed to engage in a sincere and reasoned evaluation of the prosecutor's stated reasons for exercising peremptory challenges.

At oral argument, defendants focused on the trial court's statements that it was not a "mind reader" nor willing to engage in a "psychoanalysis" as evidence it was not conducting a sincere and reasoned effort to evaluate the nondiscriminatory justifications provided by the deputy district attorney. This argument takes the trial court's conduct and analysis out of context. As previously explained in detail, the trial court saw its obligation as applying the *Wheeler, Batson* and *Johnson* rules. When a judge engages in *Batson* analysis, she or he is not engaging in psychoanalysis nor mind reading. Rather, the judge is enforcing the Constitution. The trial court reviewed the neutral nonracial reasons given by the deputy district attorney and explicitly stated it was applying *Batson.* As a result, the trial court's implied assessment of the deputy district attorney's demeanor which is supported by the evidence-based rationality of her stated reasons, leads us to conclude there is no merit to defendants' argument that the trial court did not engage in a sincere and reasoned effort to assess the nondiscriminatory justifications provided by her.

B.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante,* page 337.

## IV. DISPOSITION

The judgments are modified to reverse the Penal Code section 186.22, subdivision (b)(1)(C) enhancements imposed as to Mr. Jones, Ms. Cox and Mr. Jackson; subject Mr. Jackson to a 15-year minimum parole eligibility pursuant to section 186.22, subdivision (b)(5); impose enhancements pursuant to section 12022.53, subdivisions (b) and (c) as to all defendants and stay those enhancements pursuant to section 12022.53, subdivision (f); and correct the presentence custody credits of all defendants as set forth above. Upon remittitur issuance, the superior court clerk shall prepare amended abstracts of judgment as to each defendant and forward them to the California Department of Corrections and Rehabilitation. The judgments are affirmed in all other respects.

Armstrong, J., and Kriegler, J., concurred.

A petition for a rehearing was denied September 7, 2010, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied December 1, 2010, S186379.