Filed 12/10/15  P. v. Fuller CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B255773 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399994) |
| v. | |
| ALONZO D. FULLER et al., | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** [There is no change in judgment] |
| Defendants and Appellants. | |

BY THE COURT:

It is ordered that the opinion filed herein on November 17, 2015 is modified as follows:

On pages 3 and 4, under the section FACTUAL AND PROCEDURAL BACKGROUND, delete all references to "apartment" and replace with "house".

On page 13, in section D. Gang Evidence, before the last sentence "We disagree." Add the following sentence "Gibbs joins in this contention."

There is no change in judgment.

The Petition for Rehearing filed herein on December 1, 2015 by Gibbs is denied.

_____

BIGELOW, P. J.                    RUBIN, J.                    FLIER, J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B255773 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399994) |
| v. | |
| ALONZO D. FULLER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Gail Ruderman Feuer, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant Alonzo D. Fuller.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Reggie Reed.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant Leondre Gibbs.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following a joint jury trial, defendants Alonzo D. Fuller, Leondre Gibbs, and Reggie Reed were convicted of first degree robbery and first degree burglary; Fuller was also convicted of attempted carjacking.[1]  On appeal, they contend:  (1) denial of Reed's two *Pitchess* motions was error;[2] (2) the prosecutor's peremptory challenge to Juror No. 16 was *Batson/Wheeler* error;[3] (3) it was error to deny Gibbs' and Reed's motions for mistrial after the gang expert violated an order excluding evidence that they were self-admitted gang members; (4) the trial court had a sua sponte duty to instruct the jury not to reach a decision by flipping a coin; (5) trial counsel was ineffective for failing to request this instruction; and (6) there was insufficient evidence to support Fuller's conviction of attempted carjacking.  Each defendant also purports to join in the applicable arguments of his codefendants.  We affirm.

---

[1]     All undesignated statutory citations are to the Penal Code.

Fuller, Gibbs and Reed were jointly charged by amended information with first degree robbery (§ 211, 212.5, subd. (a)) (count 1) and burglary (§ 459, subd. (a)) (count 5); the burglary was alleged to be a violent felony (§ 667.5, subd. (c)(21)); in addition, Fuller was charged with attempted carjacking (§ 215, subd. (a))(count 2); gang enhancements were alleged as to counts 2 and 5 (§ 186.22); personal gun use enhancements were alleged as to counts 1 and 5 (§ 12022.53).  A jury found defendants guilty on all of the substantive charges and found true the violent felony enhancement as to the count 5 burglary, but found not true all gang and firearm enhancements.

Fuller was sentenced to nine years, 10 months in prison comprised of the nine year upper term on count 1 (robbery), plus a consecutive 10 months on count 2 (carjacking); sentence on count 5 was imposed but stayed pursuant to section 654.

Gibbs was sentenced to nine years in prison comprised of the 9 year upper term on count 1; sentence on count 5 was imposed but stayed pursuant to section 654.

Reed was sentenced to nine years in prison comprised of the nine year upper term on count 1; the trial court imposed but stayed sentence on count 5 pursuant to section 654.

They timely appealed.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[3]     *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

2

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358), the evidence established that in July 2012, Loren Mason and Phillip Johnson lived with their 3-year-old and 10-year-old sons in Baldwin Hills. Johnson sold rare and expensive athletic shoes on the internet and kept a large inventory of shoes at home. Johnson was not home the evening of July 12. At about 10:30 p.m., Mason was in the living room with the 3-year old while the 10 year old and a friend were taking a bath. Mason went into the family room to investigate a noise. There, she was confronted by a young African-American male wearing a hoodie and holding a gun. After complying with commands to get on the floor, Mason saw a second hoodie-clad African-American male in her apartment. The second man grabbed the crying three year old and told Mason to keep him quiet. For the next several minutes, Mason stared at the floor while she tried to keep the baby quiet. When Mason thought the intruders were gone, she got up and went out the front door in the hope of getting some identifying information. She saw men running towards her right; when she turned around, she saw two more hoodie-wearing men emerge from her apartment and flee; at least one of those two men was holding a rifle-type gun (police found a sawed off shot-gun in the shrubbery near Mason's apartment). Mason thought there may have been as many as five men in her apartment.

Unknown to Mason, while she was on the floor in the family room, her 10-year-old son and his friend had escaped through the bathroom window and run to a neighbor's house; the neighbor had called 911. Los Angeles Police Officers, including Ryan Fox, Jonathan Gan and Filberto Garcia, responded to the area immediately. A helicopter officer alerted officers on the ground to three men entering a car. After a brief police pursuit, that car stopped and three people – Gibbs, Reed and an unidentified person – jumped out of the car and ran away; items stolen from Mason's home were found in the car. Following a foot chase, Officer Fox caught Reed; Fox found two watches stolen from Mason's apartment in Reed's pocket. A few blocks away, Fuller was apprehended

as he was trying to force Y.A. into her car.  A few hours later, Gibbs was found at a residence located within the secured perimeter established by the police.

That same night, Officers Gan and Garcia drove Mason to the location where all three defendants were being detained.  Mason identified them as three of the intruders she saw in her home that night.  Gibbs was the man holding a gun that she saw first; Reed was the man she saw walking out of her apartment holding a "long gun." After Mason was told that the three men were gang members, she recanted her identification.

## DISCUSSION

### A.     *The* Pitchess *Motions*

Reed, joined by his co-defendants, contends it was prejudicial error to deny his first *Pitchess* motion seeking personnel records of arresting Officer Fox and his second such motion relating to Officers Garcia and Gan, who brought Mason to the field identification.  He argues the motions showed good cause for the discovery.  We disagree.

A *Pitchess* motion, as codified in Penal Code sections 832.7 and 832.8 and Evidence Code sections 1043 and 1045, is the sole and exclusive means by which citizen complaints against police officers may be obtained.  (*Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1539 (*Brown*).)  We review rulings on *Pitchess* motions under the abuse of discretion standard.  (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

A *Pitchess* motion must include, among other things, an affidavit showing good cause for the discovery sought.  (Evid. Code, § 1043, subd. (b); *Brown*, *supra,* 183 Cal.App.4th at p. 1539; see also *Galindo v. Superior Court* (2010) 50 Cal.4th 1, 12.)  To show good cause, the defendant must demonstrate both "(1) a 'specific factual scenario' that establishes a 'plausible factual foundation' for the allegations of officer misconduct, and (2) that the misconduct would (if credited) be material to the defense . . . ." (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, citations omitted; see also *Garcia v. Superior Court* (2007) 42 Cal.4th 63, 71 [factual scenario

4

may consist of a denial of the facts asserted in the police report; plausible scenario of officer misconduct is one that might or could have occurred, a scenario is plausible when it asserts specific misconduct that is both internally consistent and supports the proposed defense].)  The threshold showing of good cause required to obtain *Pitchess* discovery is "relatively low."  (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 83, 94, accord, *Garcia*, at p. 70.)  Neither the first nor second *Pitchess* motions met even that relatively low burden of proof.

### 1. Motion No. 1

Reed's first *Pitchess* motion, filed on March 25, 2013, sought Fox's personnel records relating to acts of "fabricating or planting evidence and/or making false statements in a police report."  The police report is not attached as an exhibit to the motion, but counsel's supporting declaration states the report inconsistently states that items 4 through 15 were found in the car and that Fox recovered items 11 and 13 (the two watches) from Reed's pocket.  The declaration does not deny that the watches and other stolen items were found in the car from which Reed was seen fleeing, but denies the watches were in Reed's pocket.

The first *Pitchess* motion does not set forth a specific factual scenario sufficient to support a claim of officer dishonesty.  The relevant police report is not attached and the motion does not identify the author of that report.  At best, the declaration shows careless report writing; it does not show any misconduct.  As such, defendant has failed to establish a plausible foundation for an allegation of planting evidence or falsifying a police report and the trial court did not err in denying the first *Pitchess* motion relating to Fox.

### 2. Motion No. 2

Defendant's second *Pitchess* motion, seeking Gan's and Garcia's personnel records relating to complaints of "acts of aggressive behavior, coercive conduct, and/or fabrication or falsifying of evidence," was filed on September 20, 2013.  Attached to that

5

motion was a letter from victim Mason to the prosecutor dated September 4, 2013.**4** Mason writes: "This letter is intended to reiterate my apprehension about being called as a witness to confirm my prior identification of the alleged perpetrator(s) at the crime scene, or to be called to identify the alleged perpetrators in court. [¶] I cannot stand by my identification of any alleged perpetrators with a clear conscience because of the circumstances surrounding the identification process as stated below." Mason goes on to state she "never really got a good look" at her assailants; she was "nervous, confused, afraid and felt under pressure from the officers conducting the identification process to positively identify the individuals presented to me;" since the crime, she has tried to forget everything about the incident and does not "really remember what they look like at all." Mason concludes that, having been told the perpetrators were gang-members who live close by, she "fears that an in-court testimony by me could very possibly subject me and my family to violent retaliation . . . ."

In his declaration in support of the second *Pitchess* motion, defense counsel states Mason's letter indicates "the officers pressured her to identify the individuals the officers presented to her for identification." But Mason's letter states only that she felt pressured; it does not describe anything the officers did to make her feel pressured. Because neither Mason's letter nor counsel's declaration establish a plausible scenario of officer misconduct, the trial court did not err in denying the second *Pitchess* motion.

## B.    *Batson/Wheeler*

Gibbs, joined by Fuller and Reed, contends the prosecutor violated their state and federal constitutional rights by using a peremptory challenge to excuse Juror No. 16, an African-American woman. The gist of his argument is that the prosecutor gave sham reasons for challenging Juror No. 16: she had two adult sons in prison and a 20-something-year-old grandson in a gang. That this was so, Gibbs argues, is demonstrated by the fact the prosecutor knew about Juror No. 16's sons when, earlier in voir dire, he

---

**4**     The crimes occurred on July 12, 2012. Mason did not testify at the preliminary hearing on February 27, 2013.

accepted a panel with the same juror on it. Further, even though the prosecutor learned about the grandson later in the proceedings after other jurors were excused, there was no evidence that Juror No. 16 had a particularly close relationship with her grandson. We find no error.

A prosecutor's use of peremptory challenges on the basis of group bias violates a criminal defendant's right to be tried by a representative cross-section of the community and the defendant's equal protection rights. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1104, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*); *People v. Catlin* (2001) 26 Cal.4th 81, 116.) The three-step approach to responding to a *Batson/Wheeler* motion is well known. " ' "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" [Citation.] [¶] 'We review the trial court's ruling on purposeful racial discrimination for substantial evidence. [Citation.] It is presumed that the prosecutor uses peremptory challenges in a constitutional manner. We defer to the court's ability to distinguish "bona fide reasons from sham excuses." [Citation.] As long as the court makes "a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered its conclusions are entitled to deference on appeal." ' [Citation.]" (*Zambrano*, at p. 1104.)

Evidence that a juror's child had been tried for a crime is a race-neutral reason for a peremptory challenge. (*People v. Jones* (2011) 51 Cal.4th 346, 366 (*Jones*).) A juror's association or substantial exposure to gang members is also a race-neutral reason. (*People v.* Cox (2010) 187 Cal.App.4th 337, 361 (*Cox*); *People v. Watson* (2008) 43 Cal.4th 652, 673 (*Watson*).)

7

Here, Juror No. 16, a married African-American woman, lived in South Central, Los Angeles. She was a housewife but had been a school maintenance worker; her husband worked in a store. She had four adult sons; one lived in Las Vegas, one worked at a factory, and the other two were in prison on drug-related charges. She did not attend either of their trials and had no opinion as to whether they were treated fairly. The fact that her sons were in prison did not make her have any special sympathy for the defendants. She felt she could decide the case based on the evidence without thinking about the consequences to the defendants. She believed she could be a fair juror. The prosecutor accepted a panel that included Juror No. 16, but the defendants continued to exercise their peremptory challenges.

During voir dire the next day, the trial court asked whether gang evidence would impact the jurors' ability to be fair and impartial. Noting that Juror No. 16 had not previously been asked about gangs, the trial court questioned her further. Juror No. 16 revealed that her 26- or 27-year-old grandson was "probably still" a gang member. She had not mentioned it the day before because she had 47 grandchildren and it just slipped her mind. Nothing about her grandson being in a gang would impact her ability to be a fair juror. All three defendants accepted the jury. But the prosecutor exercised a peremptory challenge as to Juror No. 16, to which defendants responded with a *Wheeler* motion.[5] The trial court found the first *Wheeler* prong was satisfied "[b]ased on the numbers." The prosecutor explained he excused Juror No. 16 because, cumulative to the two sons in prison, the discovery that she also had a grandson who was a current gang member convinced him that Juror No. 16 was not an appropriate juror. He did not make a for cause challenge because Juror No. 16 had said she could be fair, but the prosecutor

---

[5] This was defendants' second *Wheeler* motion. The day before, after the trial court denied the prosecutor's request to have two male African-American jurors excused for cause, the prosecutor used peremptory challenges to excuse those jurors. Defendants made a *Wheeler* motion. The trial court found the first *Wheeler* prong satisfied, but credited the prosecutor's race-neutral reason for excusing those jurors – those jurors' negative experiences with police.

was not persuaded. The trial court denied the motion, crediting the prosecutor's non-race related reason for excusing Juror No. 16.

On this record, defendants have failed to establish *Batson/Wheeler* error in the prosecutor's challenge to Juror No. 16. The trial court made a sincere and reasoned attempt to evaluate the prosecutor's reasons for the challenge. Under *Jones, supra*, 51 Cal.4th at page 366, *Watson, supra*, 43 Cal.4th at page 673 and *Cox, supra*, 187 Cal.App.4th at pages 337, 361, the trial court's finding that the challenges were not purposefully discriminatory is supported by the evidence that Juror No. 16 had two sons in prison and one grandson in a gang. That the prosecutor accepted Juror No. 16 even knowing about her sons does not compel a contrary result because the added information about her grandson could reasonably tip the scales in the mind of any prosecutor.

C.     *CALCRIM No. 3550*

Gibbs and Reed, joined by Fuller, contend the trial court had a sua sponte duty to give the following instruction, which it omitted from CALCRIM No. 3550: "Do not reach a decision by the flip of a coin or by any similar act." They make several arguments: (1) if there was no possibility a jury would arrive at a verdict by a flip of the coin, the Judicial Council would not have included the omitted sentence as an option; (2) although the Bench Notes to CALCRIM No. 3550 make the omitted sentence optional, it was required in this case because the evidence was so close; (3) the omitted sentence is not optional in CALJIC No. 17.40, a similar version of the instruction; (4) our Supreme Court in *People v. Valdez* (2012) 55 Cal.4th 82, 163, approved CALJIC No. 17.40; (5) the omitted sentence gives effect to section 1181, subdivision (4), which makes a verdict "decided by lot" grounds for a new trial; and (6) the possibility that a jury might decide a verdict by the flip of a coin was recognized by our Supreme Court in *People v. Williams* (2001) 25 Cal.4th 441, 462. We find no error.

It is well settled that in criminal cases the trial court has a sua sponte duty to " 'instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely

9

and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) A criminal defendant is constitutionally entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

The trial court's sua sponte duty to instruct that the defendant is entitled to a unanimous verdict is satisfied by CALCRIM No. 3550, which in relevant part reads: "Your verdict [on each count and any special findings] must be unanimous. This means that, to return a verdict, all of you must agree to it. [*Do not reach a decision by the flip of a coin or by any similar act.*]" (Italics added.) According to the Bench Notes for CALCRIM No. 3550, the trial court has a sua sponte duty to instruct that the jury's verdict must be unanimous, but "there is no sua sponte duty to instruct on the other topics relating to deliberations, [although] there is authority approving such instructions. [Citations.]" Defendant has provided no authority, and our independent research has found none, that imposes upon the trial court a sua sponte duty to admonish the jury against reaching "a decision by the flip of a coin or by any similar act."

That the italicized sentence gives effect to section 1181, subdivision (4), does not create such a duty. Section 1181, subdivision (4) identifies as one ground for a new trial: "When the verdict has been decided by lot, or by any means other than a fair expression of opinion on the part of all the jurors." (§ 1181, subd. (4).) But from the fact that a verdict decided by lot is grounds for a new trial, it does not necessarily follow that the trial court has a sua sponte duty to admonish the jury not to decide the verdict by a coin flip. While the trial court has the discretion, CALCRIM No. 3550 recognizes there is no sua sponte duty to so instruct.

We are not persuaded otherwise by defendants' argument that a sua sponte duty to so instruct can be inferred from the fact that CALJIC No. 17.40 includes the sentence that CALCRIM No. 3550 makes optional, and which was omitted in this case. CALCRIM No. 3550 includes in one instruction legal principles that were previously included in

10

multiple CALJIC instructions.[6]  Relevant here is CALJIC No. 17.40, which in its current form reads:

> "The People and the defendant are entitled to the individual opinion of each juror.  [¶]  Each of you must consider the evidence for the purpose of reaching a verdict if you can do so.  Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors.  [¶]  Do not hesitate to change an opinion if you are convinced it is wrong.  However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision.  [¶]  *Do not decide any issue in this case by the flip of a coin, or by any other chance determination*."  (Italics added.)

But when our Supreme Court, in *People v. Gainer* (1977) 19 Cal.3d 835, 856, approved CALJIC No. 17.40 and "commend[ed] its continued use," that instruction did not include the italicized sentence at issue here.[7]  In *Valdez, supra*, 55 Cal.4th at page 163, our Supreme Court disapproved dictum in *Gainer* which it found inconsistent with the *Gainer* court's express endorsement of the 1970 version of CALJIC No. 17.40. By the time *Valdez* was decided in 2012, the admonition against deciding the case by the flip of a coin had been added to CALJIC No. 17.40, but nothing in *Valdez* suggests it had become the trial court's sua sponte duty to give the "flip of a coin" admonition.

Also misplaced is defendants' reliance on *Williams, supra*, 25 Cal.4th at page 462. In *Williams*, the defendant challenged the trial court's dismissal of a juror who expressly

---

**6**     For example, but not limited to, CALJIC Nos. 17.30 [jury not to take cue from judge],17.32 [judge's comments on the evidence], 17.40 [individual opinions of each juror and duty to deliberate], 17.41 [how jurors should approach their task], 17.42 [admonition against discussing penalty], 17.43 [juror questions and read-back requests], 17.45 [instructions in written form], and 17.50 [selecting foreperson, etc.].

**7**     At the time, CALJIC No. 17.40 read:  "Both the People and the defendant are entitled to the individual opinion of each juror.  [¶]  It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so.  Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and instructions with the other jurors.  [¶]  You should not hesitate to change an opinion if you are convinced it is erroneous.  However, you should not be influenced to decide any question in a particular way because a majority of the jurors, or any of them, favor such a decision."

refused to follow the trial court's instructions regarding the crime of unlawful sexual intercourse with a minor, because the juror disagreed with the law criminalizing such behavior. In the context of explaining the negative consequences of encouraging juror nullification, the *Williams* court observed, "A jury even might determine that deliberations are too difficult and decide the defendant's guilt by the flip of a coin. (Pen. Code, § 1181, subd. 4 [verdict may not be decided by lot].)" The *Williams* court said nothing about a sua sponte duty to instruct the jury not to decide the case in such a manner.

Also without merit is the argument that trial counsel was ineffective in failing to request the trial court to instruct the jury not to reach a decision "by the flip of a coin or by any similar act."

To prevail on an ineffective assistance of counsel claim, a criminal defendant must show by a preponderance of the evidence that: (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) defendant was prejudiced as a result (i.e. a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different). (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) When the record on appeal sheds no light on the reason for counsel's act or omission, an ineffective assistance of counsel claim must be rejected unless there can be no satisfactory explanation for counsel's act or omission. (*Id*. at p. 219.)

We need not decide whether failure to request that the omitted language be added to CALCRIM No. 3550 fell below an objective standard of reasonableness under prevailing professional norms because defendants have failed to establish prejudice. Defendants have not shown a reasonable probability that the result of the trial would have been different if the omitted language had been given. There is nothing in the record to suggest the jury did not conscientiously deliberate and instead decided the case by the flip of a coin or some other means of chance. On this record, defendants have not established ineffective assistance of counsel.

12

*D.*     *Gang Evidence*

Reed contends the trial court erred in denying his motion for mistrial, which was based on the gang expert's violation of a pre-trial order excluding evidence that defendants admitted being gang members. Although there is no dispute gang evidence was admissible to prove the gang allegations, Reed argues the excluded evidence that he was a self-admitted gang member "likely evoked a unique emotional bias against [Reed] as an individual and deprived [Reed] of a fair trial." We disagree.

### 1.     The Evidence Code Section 402 Hearing

At an Evidence Code section 402 hearing on February 6, 2014, a gang expert testified that police use field identification cards to record details about possible gang members they encounter for the purpose of having the information available later for investigative and trial purposes. Other officers testified about encounters with Gibbs and Fuller on August 27, 2010 and Gibbs and Reed on May 3, 2012. During both encounters, Fuller, Gibbs and Reed were in custody but had not been given their *Miranda*[8] warnings when police officers asked each defendant about his gang affiliation for the purpose of filling out a field identification card. In response, each defendant admitted being a member of the Rolling 40's. Because the defendants had not been *Mirandized*, the trial court excluded evidence of all of those admissions, including any testimony by the gang expert that he relied on those statements in forming the opinion that the defendants were gang members.

### 2.     The Gang Expert's Trial Testimony

The gang expert testified without objection that the Rolling 40's is a Crips-associated criminal street gang. The expert was familiar with all three defendants and in his opinion they were all members of the Rolling 40's. Although he had been present at the time of the trial court's exclusionary ruling, remarkably, the expert testified his

---

[8]     *Miranda v. Arizona* (1966) 384 U.S. 436.

opinion as to Reed was based on "reviews of department resources, he's been documented and *self-admitted* through those resources of being a Rolling 40's gang member. He was stopped with other Rolling 40's gang members from those resources' information, and he has a tattoo [of the Anaheim Angels which is] common to the Rolling 40's Avenue Clique." (Italics added.) Additionally, Reed had gang-related tattoos and the expert reviewed photographs retrieved from the internet depicting Reed with other gang members, dressed in gang-related attire and throwing gang signs. Reed did not object to this evidence.

Next, the expert testified his opinion as to Gibbs was based on "reviewing department resources where he *self-admitted* to officers." (Italics added.) The trial court sustained Gibbs' objection that the testimony violated the trial court's exclusionary order, struck the testimony that Gibbs was a self-admitted gang member, and ordered the officer to "state an opinion without relying on that portion as to whether or not he is self-admitted and instruct the jury to disregard that portion." The expert then confirmed his opinion was also based on other things, including tattoos and photographs of Gibbs wearing gang-related sports team memorabilia and throwing gang signs.

As to defendant Fuller, the expert did not testify he was a self-admitted gang member.

Gibbs, joined by Reed, moved for a mistrial based on the expert's violation of the order excluding the evidence that defendants admitted gang membership. The prosecutor did not dispute that the expert had violated the exclusionary order, but argued the evidence was not so prejudicial as to warrant a mistrial. Although Reed had not objected at the time, the trial court stated it would strike the evidence and admonish the jury as to Reed in the same manner as it had done for Gibbs. Regarding mistrial, the trial court stated: "It is true we had a 402 regarding the self-admission. At this point I do not think it is so prejudicial that it warrants a mistrial. I do think it would be appropriate to give a curative instruction." The trial court discussed what further remedy defendants wanted, short of a mistrial. Defendants took the position that no curative admonition would be sufficient to "un-ring the bell," but did not expressly object to the trial court giving

14

additional instructions. The trial court gave the following curative instruction: ". . . I do want to be quite specific about it in telling you that in this case . . . there is no admission in this case by any of the defendants that they are members of the Rolling '40's street gang or any other gang. So just to make sure that is clear on the record."

### 3. No Abuse of Discretion

"We review the denial of a motion for mistrial under the deferential abuse of discretion standard. [Citations.] . . . '[A] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." ' [Citations.]" (*Cox, supra,* 30 Cal.4th at p. 953, disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

In this case, the trial court acted well within its discretion in finding that, although the gang expert clearly violated the trial court's order, the challenged testimony was not so prejudicial as to warrant a mistrial. It is undisputed that gang evidence was admissible in this case to prove the gang allegations. There was substantial evidence of gang membership, in addition to the excluded "self-admitted" evidence, including photographs and tattoos. Under these circumstances, the trial court could reasonably conclude that the gang expert's testimony was not "incurably prejudicial" and that its curative instructions were sufficient to ward off any possible prejudice. That the jury found the gang allegations not true bolsters our conclusion that the challenged evidence was not so prejudicial as to require a mistrial.

### E. *Sufficiency of the Evidence of Attempted Carjacking*

Fuller contends his conviction of attempted carjacking (count 2) is not supported by sufficient evidence. He argues there was no evidence from which it could reasonably be inferred that he had the requisite intent.

15

We begin with the well settled standard of review for a challenge to the sufficiency of the evidence. We review the whole record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence to determine whether there is evidence that is reasonable, credible and of solid value based upon which any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Zamudio, supra*, 43 Cal.4th at p. 357.) " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] . . . A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*Ibid*.)

" 'Carjacking' is the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence . . . against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear." (§ 215, subd. (a).) "Attempt consists of (1) a specific intent to commit a crime and (2) a direct but ineffectual act done toward its commission. (§ 21a; [citations].)" (*People v. Marquez* (2007) 152 Cal.App.4th 1064, 1067.) Attempted carjacking can be committed with the intent to either temporarily or permanently deprive the victim of possession of her car. (*Id*. at p. 1067.)

Here, Y.A. testified that at about 11:00 p.m. on July 12, 2012, she parked in the parking lot of a shopping mall to change into the comfortable shoes she kept in the car trunk; Y.A. left her keys in the ignition, the motor running and the driver's side door open while she went to the trunk and changed shoes. Y.A. continued: "And then I was trying to get in my car, I wanted to get back into my car. My car was still open, but before I did that, there was somebody stopped who was standing right there. . . . He ordered me to get into my car. . . . While he was ordering me, police arrived to the

16

scene." The only thing the man said was, "Get in the car." Y.A. was terrified. Asked how close the man was, Y.A. responded, "Too close. . . . Almost touching my back. He was right behind. He was too close to me."

The incident was observed by Officer Smith, who was on his way to the location being broadcast by a police helicopter. In the illumination being provided by the helicopter, Smith saw Fuller running towards Y.A., who was standing next to the open driver's side door of a parked car. Fuller got behind Y.A. and put both of his hands on her shoulders. A video tape of the incident, taken by the police helicopter, was played for the jury.

From the evidence that, while fleeing police following the earlier break-in and robbery, Fuller ran up to a woman he did not know and ordered her to get into her car, the motor of which was running, it is reasonable to infer that Fuller intended to use the car as a getaway vehicle and the woman as his getaway driver. Contrary to Fuller's argument, that Fuller was apprehended before he actually got into Y.A.'s car is not determinative. Fuller's act of ordering Y.A. to get into her car was sufficient to constitute the ineffectual act necessary for an attempted crime.

## DISPOSITION

The judgments are affirmed.


RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



FLIER, J.


17