Filed 6/27/16  P. v. Bautista CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050352 |
| v. | (Super. Ct. No. 11NF2283) |
| RICARDO C. BAUTISTA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William R. Froeberg, Judge.  Affirmed as modified.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

The trial court sentenced defendant Ricardo C. Bautista to prison for life without the possibility of parole after a jury found him guilty of first degree murder with a special circumstance finding that he committed the murder to further the activities of a criminal street gang. In addition, the court imposed an additional prison term based on the jury's true findings on criminal street gang and firearm discharge enhancement allegations. The court also ordered defendant to pay restitution and parole revocation fines.

On appeal, defendant asserts the trial court committed procedural and evidentiary errors during trial that justify reversing his conviction. Procedurally, he contends the court erred in rejecting his motion alleging the prosecutor improperly used peremptory challenges against Hispanic prospective jurors. The evidentiary claims include: (1) Allowing a proposed defense witness exercise her privilege against self-incrimination and then declining to grant the witness immunity; (2) excluding defendant's statement to the police expressing remorse for the victim's death; and (3) allowing the prosecution to impeach defendant with a prior conviction for felony drunk driving that resulted in another person's death. We conclude defendant has failed to establish any prejudicial error and affirm his conviction.

Alternatively, defendant claims the trial court erroneously imposed the parole revocation fine. The Attorney General concedes this was error. Based on the concession, the matter shall be remanded to the trial court with directions to eliminate the parole revocation fine. In all other respects, the judgment is affirmed.

FACTS

Late in the afternoon of October 17, 2004, defendant shot and killed Alex Rodarte in an alley behind an apartment complex. The prosecution presented evidence that defendant and Rodarte belonged to rival criminal street gangs; defendant a member

2

of Boys From The Hood while Rodarte belonged to West Side Anaheim. The shooting occurred in an area claimed by a street gang aligned with Rodarte's gang.

Initially, however, the police were unable to identify the shooter. In several interviews conducted over the succeeding years Melissa Pinto-Solis (Solis), a tenant in an apartment building adjacent to the alley at the time of the shooting, gave the police inconsistent statements about what she saw and heard that day. At trial, Solis testified that, while throwing out some trash, she saw a green-colored Honda Civic occupied by two females and two males parked in front of her building. A man stepped out of the front passenger door and passed by her as she returned to her apartment. Shortly thereafter, Solis heard a gunshot. Leaving her apartment, Solis saw the same man walking away from the alley. He was holding a gun and had a blue or dark-colored bandanna covering his face. The man reentered the green car, which then left the area.

Police officers showed Solis some photographs. But she was unable to positively identify anyone as the shooter.

In 2006, the police received information that the occupants of the green-colored Honda Civic on the day of the shooting included defendant and a woman named Jolean Disbrow. However, the person providing this information denied he was an eyewitness and gave inconsistent accounts of what he had been told.

In early 2011, a police investigator talked to Disbrow while she was in custody on an unrelated charge. A few months later, two police officers questioned defendant. A redacted version of his interrogation was played at trial.

During the interrogation, defendant initially denied knowing anything about the shooting. After further questioning, defendant admitted he shot the victim, claiming "it was a mistake" and that he "overreact[ed]." Defendant claimed that he had been constantly ingesting methamphetamine and had not slept for three days before the shooting. He went to the alley looking for a woman named Rosie, with whom he had used drugs in an adjoining garage the night before.

3

Defendant denied that he carried a gun on a regular basis and said he was unarmed while in the alley the previous night. But on the day of the shooting defendant claimed he grabbed a "neighborhood" gun "for protection."

According to defendant, a woman he had just met drove him to the area. As defendant walked into the alley, three men "hit him up," i.e., asked where he was from. Defendant replied, "Boys." He then thought the group said "Small Town," a rival gang. Defendant shot a person "arguing with" him. Defendant estimated the men were 15 feet away at the time he fired and acknowledged they did not display any weapons. After the shooting, defendant left the alley. He claimed the shooting was the only time he used a gun and that he sold the weapon a week later in order to buy more drugs. Defendant said he learned "through the girls" the victim had died, but he denied bragging about the shooting.

Defendant testified in his defense at trial. Initially he claimed to have experienced a difficult childhood, marred by an abusive, alcoholic father and being molested by a family relative.

At a very young age defendant joined Boys from the Hood and began drinking and using drugs. He acknowledged having a tattoo that depicted a gang member with a bandanna containing the gang's initials. Defendant also testified that he had been shot at least twice after hit-ups.

In his early twenties, defendant began using methamphetamine. At the time of the shooting, he claimed to be "constantly using meth" and not sleeping. Defendant repeated his claim that the day before the shooting he was in a garage bordering the alley with Rosie and several other people using drugs. On direct examination, he denied knowing the alley was claimed by a rival gang. During cross-examination, the prosecution confronted defendant with a photograph depicting a rival gang's graffiti on the garage wall. Defendant denied seeing the graffiti.

4

According to defendant, later that night he went to a hotel room and continued partying with several other persons, including Disbrow, a female gang member. The next day defendant, Disbrow, another gang member who used the moniker Travieso, left the motel in a car driven by a woman named "Lisa." The four spent the day driving around looking for more drugs to ingest.

Defendant acknowledged he was carrying the gun, but now claimed he had acquired it several days earlier. On direct examination, defendant said the gun belonged to a fellow gang member who had been arrested. Defendant testified, "I . . . thought it was my responsibility to take" possession of the weapon while his confederate was in custody. When confronted with his prior statement to the investigators describing the weapon as "a neighborhood gun," defendant said he had lied to them.

Defendant admitted giving "Lisa" directions to the apartment complex adjacent to the alley, claiming he hoped to find Rosie and buy drugs. He acknowledged carrying a bandanna, but insisted he only used it to wipe off sweat.

As he entered the alley several individuals standing about 30 feet away hit him up. Defendant became "scared" when the group "rush[ed] towards" him after he responded, "Boys." He then "panicked," pulled out the gun, and fired in the direction of the group. Defendant then left the alley and returned to the car, telling Lisa "Let's go." He denied encountering Solis either on the way to the alley or upon returning to the car. Defendant said he sold the gun one or two days later so that he could buy more drugs. He claimed the shooting "bother[ed]" him, he "never planned on doing" it, and felt "ashamed" about it. One of the investigators who interrogated him offered defendant the chance to write a letter to Rodarte's mother, and he accepted it.

The defense also called a neuropsychologist who evaluated defendant. The neuropsychologist expressed the opinion that defendant was suffering from post-traumatic stress disorder (P.T.S.D.) when he shot and killed Rodarte.

5

DISCUSSION

*1.  Jury Selection*

*1.1  Introduction*

During jury voir dire, defense counsel made a motion, challenging the prosecutor's use of peremptory challenges.  In support of the motion, defense counsel cited the prosecutor's use of five peremptory challenges to strike young female Hispanic prospective jurors.  The trial court noted one of the prospective jurors cited by defense counsel was actually a Filipino-American.  But, finding "there appears to be trends on both sides" concerning the use of peremptory challenges, the court asked the prosecutor to explain his reasons for striking the five prospective jurors.  After the prosecutor complied, the trial court found the reasons given were race neutral and overruled defense counsel's motion.

On appeal, defendant limits his attack of the trial court's ruling to two prospective jurors, which he claims were excluded because they were Hispanic.  Contrary to the Attorney General's argument, Hispanics constitute a cognizable group for purposes of the prohibition against using peremptory challenges to exclude members because of group bias.  (*People v. Trevino* (1985) 39 Cal.3d 667, 683-686, disapproved on another ground in *People v. Johnson* (1989) 47 Cal.3d 1194, 1219-1221.)  Nonetheless, defendant's argument fails on the merits.

*1.2  Background*

Since defendant challenges the striking of only two Hispanic prospective jurors, we limit our summary of the evidence to them.

K.C. worked at a hospital registering patients.  She had attended college and her "former spouse was in the military."  When defense counsel asked the panel if anyone "had . . . close friends or relatives that have had drug or alcohol problems," K.C.

6

mentioned she has "friends that have had drug issues in the past. Not as much now." Asked if "it affect[s] your ability to trust them," K.C. said "Um, not really. I mean, maybe because I wasn't that close to them. It wouldn't affect me."

After K.C. acknowledged her former husband saw combat while in the military, the following colloquy with defense counsel occurred: "Were you with him after he came back from combat? [¶] A No. Our divorce was pending . . . . [¶] Q . . . Other than having to see him through the divorce, did you still have any other form of relationship with him, talk to him regularly, see what he was like as a result of that activity involving combat . . . ? [¶] A It did affect him. We . . . think he might have some P.T.S.D. a little bit. I still have contact with him 'cause we have a daughter. He's pretty normal, but we think he still has a little bit. [¶] Q Some issues? [¶] A Yeah."

L.M. stated she worked as a cashier at a fast food restaurant and resided in the City of Placentia. She was not married and did not have any children. When asked about her neighborhood, L.M. described it as being claimed by a "gang called Los Cerros Plas," and noted "they're always around there." Asked if the presence of the gang would affect her ability to sit on the case, L.M. said, "No, I hardly ever go. They're in a car. They're not walking around."

When defense counsel asked the jury pool if "anyone . . . had a particularly tough upbringing," L.M. said her "dad was an alcoholic." L.M. also admitted she got into a fight while in middle school "over a guy." She described the altercation as "sad" and "really dumb."

When the defense challenged the prosecutor's use of peremptory challenges, the latter gave the following explanation for striking K.C. and L.M. The prosecutor said K.C. "mentioned that she had some personal belief that her ex-husband may have been suffering from P.T.S.D," "[a]nd also had friends with drug issues. And for those particular reasons[,] I was not excited about having her on the jury." He struck L.M. because, "she lived . . . in the Placentia gang area[,] . . . which I'm very familiar

7

with from my prior days in law enforcement with the City of Placentia. She said that she had been involved in a fight previously and her dad was an alcoholic. And, in addition to that, although I don't judge people strictly by their looks, the way that she looked concerned me just a bit with the way . . . many pictures I've seen of Hispanic females who are connected with criminal street gangs. Not that I'm saying that she was . . . ."

Defense counsel submitted the motion without further argument. The trial court stated, "I can't say from the reasons given by the prosecutor that the peremptories have been race based. They appear to be race neutral challenges. So at this point, I will deny the . . . motion." The defense did not renew the motion.

### 1.3 Analysis

Under *Batson v. Kentucky* (1986) 476 U.S. 79, 89 [106 S.Ct. 1712, 90 L.Ed.2d 69], a party is forbidden from "'striking even a single prospective juror for a discriminatory purpose.'" (*Snyder v. Louisiana* (2008) 552 U.S. 472, 478 [128 S.Ct. 1203, 170 L.Ed.2d 175]; *People v. Lenix* (2008) 44 Cal.4th 602, 612 ["Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution"].)

When a criminal defendant asserts that a prosecutor is using peremptory challenges to exclude members of a cognizable group, the trial court employs a three-step process to resolve the claim. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'" (*Johnson v. California* (2005)

8

545 U.S. 162, 168 [125 S.Ct. 2410, 162 L.Ed.2d 129]; *People v. O'Malley* (2016) 62 Cal.4th 944, 974 (*O'Malley*).)

The trial court did not expressly rule the defense had made a prima facie showing the prosecutor struck prospective jurors for impermissible reasons. But it commented "there appears to be trends on both sides" concerning the use of peremptory challenges, and turned to the prosecutor for an explanation of his reasons for striking the prospective jurors identified by the defense. In this context, "we may infer an implied prima facie finding" (*People v. Arias* (1996) 13 Cal.4th 92, 135), "and proceed directly to review of the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1; *O'Malley, supra*, 62 Cal.4th at pp. 974-975.) "Thus, the sole question before us is whether the trial court correctly ruled that the defense did not satisfy its burden of demonstrating discriminatory motivation at the third stage of the *Batson* inquiry." (*O'Malley, supra*, 62 Cal.4th at p. 975.)

The reasons expressed by the prosecutor for his decision to challenge K.C. and L.M. were race-neutral. As to K.C., the prosecutor cited two reasons; the possibility her ex-husband may be suffering from "a little bit" of P.T.S.D., and that she had friends who had drug problems in the past. These factors were clearly relevant to the facts in this case. The same is true for the prosecutor's decision regarding L.M. She lived in an area claimed by a street gang, had gotten into a fight when she was younger, and the prosecutor felt she had an appearance similar to what he associated with female gang members.

Defendant questions the merits of the prosecutor's explanations for striking these prospective jurors. As for K.C., defendant asserts "[i]t is hard to imagine that whatever minor amount of P.T.S.D. [her] ex-husband may have had, it affected [K.C.] in this case such that it justified a strike against her." He also claims the prosecutor's concern about K.C. having friends who used drugs lacked merit because the "drug issues" were "in the past," and K.C. "was not particularly close to those people."

9

Concerning L.M., defendant argues "the prosecutor failed to explain the significance of th[e] fact" she lived in an area claimed by a criminal street gang.  He also disputes the prosecutor's mention that L.M. looked like a female gang member, noting "nothing in the record indicated" L.M. "had any connection with a gang."  Finally, he notes L.M.'s fight occurred when she was an adolescent.  We are not persuaded.

First, defendant's argument strongly suggests the reasons expressed would not support a challenge for cause as to either K.C. or L.M.  But that is not the correct test.  "'The proper focus of a *Batson* . . . inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. . . .  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.'"  (*O'Malley, supra*, 62 Cal.4th at p. 975.)  Thus, a "prosecutor's '"justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice."'"  (*Ibid.*)

Second, defendant's argument ignores the applicable standard of review.  "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.  [Citations.]  The trial court has a pivotal role in evaluating *Batson* claims.  Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, [citation], and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge,' [citation].  In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's firsthand observations of even greater importance.  In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.  We have recognized that these determinations of credibility and demeanor lie '"peculiarly within a trial judge's province,"' [citation], and we have stated

10

that 'in the absence of exceptional circumstances, we would defer to [the trial court],' [citation]." (*Snyder v. Louisiana, supra*, 552 U.S. at p. 477; *O'Malley, supra*, 62 Cal.4th at p. 975 [appellate court reviews """"trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges '"with great restraint,"""" with a presumption """"a prosecutor uses peremptory challenges in a constitutional manner"""].)

Defendant questions the genuineness of the prosecutor's mention of K.C.'s ex-husband's P.T.S.D. and L.M.'s appearance because he did not ask question on these topics. But the trial judge and defense counsel covered the subject of P.T.S.D. Given the scope of their inquiries on this subject, there was no need for the prosecutor to go over the same territory when it came time for him to individually question prospective jurors.

As for L.M.'s appearance, it is difficult to think of how a party might address the subject of a prospective juror's appearance without embarrassing him or her or possibly offending the entire jury pool. What's more, a prospective juror's appearance is an acceptable basis for a peremptory challenge even where it has not been the subject of jury voir dire. (*People v. Elliott* (2012) 53 Cal.4th 535, 566-569 [prospective juror described as looking "'bizarre,'" and having "'an odd appearance'"]; see *Snyder v. Louisiana, supra*, 552 U.S. at p. 477 ["race-neutral reasons for peremptory challenges often invoke a juror's demeanor"]; *O'Malley, supra*, 62 Cal.4th at p. 975 ["'[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons'"].)

Third, the prosecutor's concern about where L.M. lived was not only relevant to the facts of this case, it constituted a permissible reason to peremptorily challenge her. (*People v. Watson* (2008) 43 Cal.4th 652, 674 [prospective juror's "substantial exposure to gangs" constituted "a relevant, race-neutral reason for the prosecutor to exercise a peremptory challenge against her"]; *People v. Cox* (2010) 187 Cal.App.4th 337, 348, 356 ["contacts with members of street gangs where [a] . . . juror

11

lived," and "familiarity with the gangs in [the] area" justify use of a peremptory challenge].)

Alternatively, defendant argues a comparative juror analysis reflects the prosecutor's reliance on gangs, drug use, and fighting were pretextual. "[I]n considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." (*Snyder v. Louisiana, supra*, 552 U.S. at p. 478.) "If a prosecutor's proffered reason for striking a . . . panelist [belonging to a cognizable group] applies just as well to an otherwise-similar [person] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241 [125 S.Ct. 2317, 162 L.Ed.2d 196].) Thus, "comparative juror analysis is . . . one form of circumstantial evidence that is relevant," and while "not necessarily dispositive, on the issue of intentional discrimination," it "must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*People v. Lenix, supra*, 44 Cal.4th at p. 622.)

Here, the appellate record contains a transcript of the entire jury selection process. But at trial, defendant did not request the trial court to conduct a comparative juror analysis to determine whether the prosecutor's reasons for striking K.C. and L.M. were pretextual. The United States Supreme Court has "recognize[d] that a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." (*Snyder v. Louisiana, supra*, 552 U.S. at p. 483.) The California Supreme Court has echoed this concern. "Where, as here, the comparative analysis was not made at trial, 'the prosecutor generally has not provided, and was not asked to provide, an explanation for nonchallenges.' [Citation.] Therefore, 'an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.'

12

[Citation.]" (*O'Malley, supra*, 62 Cal.4th at p. 976, quoting *People v. Jones* (2011) 51 Cal.4th 346, 365 and *Snyder v. Louisiana, supra*, 552 U.S. at p. 483.)

As a consequence, "[w]hen a defendant asks for comparative juror analysis for the first time on appeal, we have held that 'such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent.'" (*O'Malley, supra*, 62 Cal.4th at p. 976.) "The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment. Further, the trial court's finding is reviewed on the record as it stands at the time the . . . ruling is made. If the defendant believes that subsequent events should be considered by the trial court, a renewed objection is required to permit appellate consideration of these subsequent developments." (*People v. Lenix, supra*, 44 Cal.4th at p. 624.)

Here, two of the three prospective jurors defendant identifies as also admitting to having a relative or friend who used drugs, and one of the two prospective jurors he notes admitted being involved in fights, were seated and questioned subsequent to the *Batson* motion. Since defendant did not renew his motion after these prospective jurors were passed over by the prosecution, defendant's reliance on these individuals must be rejected.

Thus, we focus on the two prospective jurors identified by the defense who were members of the jury panel when defendant challenged the prosecutor's use of his peremptory challenges; Juror Nos. 4 and 10. Juror No. 4 was a retiree, married, with two adult children. His niece worked for the Federal Bureau of Investigation and "one of [his] best friends" was a police officer. A friend of his wife had been murdered a few years earlier. He admitted suffering a drunk driving conviction 10 years ago, but felt that he was "treated fairly." Juror No. 4 acknowledged getting into "a fistfight" as "a teenager." He had previously served as a juror in civil trial and the jury was able to reach a verdict.

13

Juror No. 10 stated she had an Associate's degree in business, worked as a marketing consultant, was engaged to be married, had a friend who is an attorney specializing in worker's compensation law, and her future sister-in-law was employed as a paralegal. Her "soon to be nephew-in-law" was awaiting trial on criminal charges, including drunk driving and striking a police officer. She also acknowledged her own nephew "is involved with some pretty heavy drugs."

In comparing these jurors to K.C. and L.M., "'a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.' [Citation.] In conducting this inquiry, we bear in mind that comparative juror analysis is not simply an exercise in identifying any conceivable distinctions among prospective jurors. . . . Rather, because the ultimate question before us concerns the prosecutor's motivations in exercising the challenge in question, we must ask whether there were any *material* differences among the jurors—that is, differences, other than race, that we can reasonably infer motivated the prosecutor's pattern of challenges." (*O'Malley, supra*, 62 Cal.4th at p. 977.)

Defendant argues K.C. and Juror No. 10 were comparable because both acknowledged having family or friends with drug issues. But one material difference between them was their responses to the question of whether they would feel comfortable sharing opinions with the other jurors during deliberations. K.C., although having a job requiring frequent contact with the public, described herself as "shy," and said she would feel "[a] little bit uncomfortable" in an "environment" where she would have to "sit together and discuss" the case "with 11 virtual strangers." On the other hand Juror No. 10, a marketing consultant, responded "[y]es," when asked if she "[w]ould . . . feel comfortable [freely] sharing [her] opinions . . . with a bunch of strangers." A prosecutor would likely be more willing to accept a juror who readily expresses a willingness to engage in deliberations than one who indicates she might feel uncomfortable in that

14

situation. (*People v. Watson, supra*, 43 Cal.4th at p. 681 [prospective juror who "appeared to be too stubborn and opinionated to appropriately participate in jury deliberations" properly struck for a "relevant, race-neutral concern[]"].)

Concerning L.M., defendant argues Juror No. 4 was comparable because both acknowledged getting into a fight. But one material difference suggested by the record is the difference in their ages and life experiences. Youth and limited life experiences constitute valid, nonpretextual reasons for peremptorily challenging a prospective juror. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 108; *People v. Gonzales* (2008) 165 Cal.App.4th 620, 631.) In making his *Batson* motion, defense counsel described all of the challenged jurors as being "young," and when questioning L.M. he mentioned she appeared "pretty young." In contrast, Juror No. 4 was retired, with two adult children and the fistfights he mentioned had occurred when he was a teenager. Juror No. 4 also had ties to law enforcement. (*O'Malley, supra*, 62 Cal.4th at p. 979 ["nature and extent of [comparative prospective juror's] ties to law enforcement and criminal justice administration . . . would have differentiated [him] from [the challenged juror] from the prosecutor's perspective"].) Thus, Juror No. 4's drunk driving conviction notwithstanding, his age, more extensive life experience, and association with law enforcement may have made him a more acceptable choice as a juror for the prosecution.

Given the record in this case, not only were the prosecutor's reasons for striking K.C. and L.M. facially race-neutral, but defendant failed to carry his burden of establishing any of those reasons were merely pretextual. Consequently, the trial court properly overruled his *Batson* motion.

2. *The Proffered Testimony of Jolean Disbrow*

2.1 *Background*

Before trial, defense counsel stated his intention to call Disbrow as a witness to support the credibility of defendant's statements to the police about the

shooting. Concerned this testimony might tend to incriminate Disbrow, the trial court appointed an attorney to represent her. The defense also filed a motion asking the court to grant Disbrow judicial immunity if it determined the testimony would tend to incriminate her.

Defense counsel made an offer of proof concerning Disbrow's expected testimony. He expected Disbrow to corroborate defendant's account of his whereabouts and activity the night before and during the day of the shooting, including; the lack of any mention of a gun, entering an area claimed by a rival gang, or shooting a rival gang member. He said Disbrow would testify that after defendant left the car at the apartment complex, she saw several men in the alley, heard the shot, saw the victim fall down, and defendant then return to the car. Defense counsel said Disbrow would also corroborate the fact there was no discussion of the shooting upon leaving the apartment complex area. Finally, defense counsel believed Disbrow's testimony would tend to contradict Solis's testimony on certain key issues, although he acknowledged Disbrow would "probably . . . say that [defendant] had a bandanna on his face" when he returned to the car.

Defense counsel argued the evidence was not sufficient to support Disbrow's invocation of her privilege, claiming there is no evidence of collusion between her and defendant and, although the prosecution took a statement from her in 2011, they never charged her with any involvement in Rodarte's murder. The prosecutor disputed defense counsel's analysis, citing evidence of Disbrow's affiliation with Boys in the Hood and claiming her involvement in the case was more than as a mere observer.

The attorney appointed to represent Disbrow informed the court she intended to advise Disbrow to invoke her Fifth Amendment privilege against self-incrimination.

The trial court held an in camera discussion of the matter with Disbrow's attorney. The attorney corroborated the prosecution's assertions about Disbrow's gang

16

affiliations and the existence of other evidence suggesting Disbrow had greater involvement in the shooting than represented in the courtroom.

The trial court found Disbrow's testimony could expose her to criminal liability. When asked, Disbrow stated she intended to invoke her right not to answer questions. The court also denied defendant's alternative request that it grant Disbrow judicial immunity, finding there was "a strong governmental interest in prosecuting people responsible for murders," Disbrow's "proffered testimony [was] not clearly exculpatory," nor was it "essential" to the defense.

### 2.2 Analysis

Claiming Disbrow "was merely a passenger in the vehicle," defendant argues she "had no 'reasonable cause to apprehend danger from a direct answer,'" and "her answers would not have 'furnish[ed] a link in the chain of evidence needed to prosecute' her for a criminal offense." Thus, he contends the trial court's rulings allowing Disbrow to invoke her privilege against self-incrimination, and denying his motion to grant Disbrow judicial immunity, violated his constitutional rights to compulsory process and due process.

Both contentions lack merit. *People v. Williams* (2008) 43 Cal.4th 584 summarized the principles relevant to Disbrow's invocation of the privilege against self-incrimination. "It is a fundamental principle of our law that witnesses may not be compelled to incriminate themselves, and the scope of a witness's privilege is liberally construed. . . . [¶] 'A witness may assert the privilege who has "reasonable cause to apprehend danger from a direct answer."' [Citation.] Moreover, '"[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." [Citation.] To deny an assertion of the privilege, "the judge must be '"*perfectly clear,*

17

from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency" to incriminate.''" [Citations.] Given the broad protective scope of the privilege, waiver of a nonparty witness's privilege 'is not to be lightly inferred.'" (*Id.* at pp. 613-614.)

As defendant notes, an appellate court independently reviews the trial court's ruling on a witness's assertion of his or her privilege against self-incrimination. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.) Further, at defendant's request we have reviewed the sealed transcript of the trial court's in camera discussion with Disbrow's attorney.

Nonetheless, the trial court properly found that Disbrow was entitled to invoke the privilege in this case. While the prosecution had not yet charged Disbrow in this case, the crime of murder does not have a statute of limitations. The prosecution's gang expert testified some Hispanic gangs, including Boys in the Hood, had female gang members. And the prosecutor emphasized the fact there was evidence Disbrow was an active member of the gang, asserting her home was used as a crash pad for gang members. The prosecutor also claimed the transcript of Disbrow's statement to the police differed from defense counsel's offer of proof concerning her expected testimony. In addition, the evidence indicated a third gang member was also in the car. This evidence, along with expert testimony concerning the fact gang members know the claimed territories of rival gangs, apprise other gang members when armed, and usually take back-up when they commit a crime, justified the trial court's conclusion Disbrow's testimony ""would furnish a link in the chain of evidence needed to prosecute" [her] for a criminal offense.'" (*People v. Williams, supra*, 43 Cal.4th at p. 614; *Hoffman v. United States* (1951) 341 U.S. 479, 486 [71 S.Ct. 814, 95 L.Ed. 1118].)

Defendant's alternative claim that the trial court erred in refusing to grant Disbrow judicial immunity fares even less well. The California Supreme Court has recognized that generally "the power to confer immunity is granted by statute to the

18

executive, that is, to the prosecution." (*People v. Stewart* (2004) 33 Cal.4th 425, 468; see Pen. Code, § 1324.)  While several earlier decisions "'characterized as "doubtful" the "proposition that the trial court has inherent authority to grant immunity"'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1050-1051), in *Masters* the Supreme Court finally rejected that proposition altogether.  *Masters* held, "California courts have no authority to confer use immunity on witnesses." (*Id.* at p. 1051.)

Even if the law were otherwise, we agree with the trial court that the requisite elements for granting immunity in this case are nonexistent.  Defendant argues that Disbrow's testimony was exculpatory and essential to his defense because she could corroborate his statements to the police.  But she was not in the alley when the shooting occurred.  At best, Disbrow saw defendant enter the alley, heard the shot, and saw one of the men in the alley fall to the ground.  But the question in this case is why did defendant shoot Rodarte.  He also claims Disbrow could corroborate the fact nothing was said in the car after the shooting.  But since the foursome were purportedly driving around looking for drugs, one could view the asserted postshooting silence as a deafening indictment of defendant's guilt.  If the purpose of the trip was to obtain drugs, one would expect the vehicle's occupants to be curious about where defendant obtained the weapon and why he shot a man in the alley.  This conclusion is particularly true if, as defense counsel acknowledged, Disbrow would testify defendant was wearing the bandanna over his face upon returning to the car.

The trial court properly ruled on Disbrow's invocation of her Fifth Amendment privilege against self-incrimination and defendant's request that she be granted judicial immunity.

### 3. *Exclusion of Defendant's Statements of Remorse*

As noted, a redacted version of defendant's statements to the police was played for the jury during trial.  The deleted portions of the interrogation included

19

comments by defendant in which he expressed remorse for shooting Rodarte. During a pretrial hearing, defense counsel argued defendant's statements of regret for the shooting should remain, claiming they "go[] to [defendant's] credibility in [his] confession" and would allow the jury to "get an idea of whether or not this is something that was in his character at the time." But the court disagreed stating, "I don't think the defendant's state of mind in 2011 is relevant on his state of mind at the time of the events in 2004."

On appeal, defendant claims the trial court's exclusion of his statements expressing remorse for killing Rodarte violated his constitutional rights to due process and to present a defense. This argument lacks merit.

First, the trial court correctly ruled defendant's expressions of remorse during an interrogation that occurred nearly seven years after the shooting were not relevant to the issues in this case. To be admissible, proffered evidence must be relevant. (Evid. Code, § 350.) The Evidence Code defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "A trial court has 'considerable discretion' in determining the relevance of evidence," and "[a]n appellate court reviews a court's rulings regarding relevancy . . . for abuse of discretion." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Thus, "[w]e will not reverse a court's ruling on such matters unless it is shown "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Ibid.*)

Defendant relies on case law admitting evidence of "extrajudicial statements . . . to show evidence of [a] declarant's mental state of mind." While hearsay evidence of defendant's state of mind at the time he shot and killed Rodarte would be admissible, the issue here concerns defendant's assertions of how he felt about the shooting six and one-half years after the shooting. "A prerequisite to th[e state of mind] exception to the hearsay rule is that the declarant's mental state or conduct be factually

20

relevant." (*People v. Hernandez* (2003) 30 Cal.4th 835, 872, overruled on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) Defendant's statements did not refer to how he felt about the shooting in 2004, but rather his feelings in 2011.

Second, even assuming the expressions of remorse could be found to have some relevance on this issue, the trial court's pretrial ruling did not have the effect of barring all evidence of defendant's rueful feelings about the shooting. The redacted interrogation played for the jury contained periods of silence when the officers began to question defendant about the shooting, his assertion the shooting "was a mistake" that "should've never happened," that it "bother[ed] [him] a lot," and had been "bugging [him] for a while." Later, when asked why he did not tell his fellow gang members about the shooting, defendant stated, "I wish it would never [have] happened." Also, when questioned about the times he was injured during hit-ups, defendant responded, "Sometimes I just ask myself . . . [w]hy I didn't die all those times that I . . . was shot or stabbed? And now go on and do something stupid like that."

Additionally, when testifying at trial, defendant stated it was difficult to discuss the shooting with the police, but he decided to admit shooting Rodarte because "it had really been bothering me," and that he felt "ashamed" for "what I put his Mom through." He was also allowed to testify he decided to accept one officer's offer to write a letter to Rodarte's mother.

Defendant's reliance on *People v. Dykes* (2009) 46 Cal.4th 731 is inapposite. There, during unrecorded questioning by the police, the defendant denied his participation in a shooting. In a later recorded session that was played at trial, when confronted with eyewitness accounts of his involvement, the defendant "became emotional, eventually admitting most of his role in the crimes during two statements interrupted by audible sobbing." (*Id.* at p. 767.)

The Supreme Court rejected the defendant's appellate claim that the prosecutor committed misconduct by asking the officer about the defendant's initial lack

21

of remorse during the portion of the interrogation where he denied responsibility for the shooting. It acknowledged the general rule that, "'[U]nless a defendant opens the door to the matter in his or her case-in-chief [citation], his or her remorse is irrelevant at the guilt phase.'" (*People v. Dykes, supra*, 46 Cal.4th at p. 768.) But the court concluded the defendant's "sobbing during his tape-recorded statements to the police and to the deputy district attorney, . . . supported the inference that he experienced remorse" (*ibid.*), and thus "the issue of [a] defendant's demeanor and state of mind during his various statements to the police was relevant to the credibility of those statements." (*Ibid.*)

As discussed above, the tape recording of defendant's interrogation included defendant's statements the shooting was a mistake and that he had been bothered about it for some time. The defense was also allowed to question one of the investigating officers about defendant's demeanor and emotional responses during the interrogation. The officer acknowledged defendant was "shy," "nervous," "soft-spoken," and was reluctant to look directly at the officers.

Consequently, the trial court did not err in deleting certain portions of defendant's interrogation that contained his expressions of remorse for shooting Rodarte.

*4. Impeachment*

During a pretrial hearing, the prosecutor stated that, in the event defendant took the stand in his own defense, he wanted to impeach defendant with three prior felony convictions; two for commercial burglaries and a conviction for driving while under the influence of alcohol in which a passenger in the car died. Defense counsel objected to the use of the felony drunk driving conviction, arguing that offense did not involve moral turpitude. The trial court overruled the objection, citing *People v. Forster* (1994) 29 Cal.App.4th 1746.

On appeal, defendant contends the trial court's decision to allow the use of his felony drunk driving conviction for impeachment violated his constitutional right to

due process because that crime, standing alone, does not involve moral turpitude. Further, because that conviction resulted in the death of a passenger, he claims its admission constituted prejudicial error.

While it was error for the trial court to admit defendant's prior drunk driving conviction to impeach him, the error was not prejudicial under the circumstances of this case.

"Subject to the trial court's discretion under Evidence Code section 352, California Constitution, article I, section 28, subdivision (f), 'authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty.'" (*People v. Gabriel* (2012) 206 Cal.App.4th 450, 456.) But "a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 317.) "Whether a conviction involves such turpitude is a question of law." (*People v. Collins* (1986) 42 Cal.3d 378, 390; *People v. Aguilar* (2016) 245 Cal.App.4th 1010, 1017.)

The elements of a felony drunk driving conviction "are '(1) driving a vehicle while under the influence of an alcoholic beverage or drug [or while driving with a blood alcohol level of .08 percent or more]; (2) when so driving, committing some act which violates the law or is a failure to perform some duty required by law; and (3) as a proximate result of such violation of law or failure to perform a duty, another person was injured. . . . To satisfy the second element, the evidence must show an unlawful act or neglect of duty *in addition* to driving under the influence.' [Citation.] The unlawful act or omission 'need not relate to any specific section of the Vehicle Code, but instead may be satisfied by the defendant's ordinary negligence." (*People v. Weems* (1997) 54 Cal.App.4th 854, 858, fn. omitted; *People v. Givan* (2015) 233 Cal.App.4th 335, 349.)

To date, no case has held that felony drunk driving constitutes a crime involving moral turpitude. The trial court relied on *People v. Forster, supra*, 29

23

Cal.App.4th 1746 to allow the use of defendant's drunk driving conviction for impeachment. But that case involve a prior conviction under former Vehicle Code section 23175, which dealt with a drunk driving conviction occurring "within seven years of three or more separate [prior drunk driving] violations." (Repealed by Stats. 1998, ch. 118, § 41; now Veh. Code, § 23550.) In finding this offense involved moral turpitude, the Court of Appeal emphasized it was "a recidivist type crime involving an extremely dangerous activity. Having suffered at least three previous convictions for driving under the influence, a person who has violated section 23175 is presumptively aware of the life-threatening nature of the activity and the grave risks involved. [Citation.] Continuing such activity despite the knowledge of such risks is indicative of a 'conscious indifference or "I don't care attitude" concerning the ultimate consequences' of the activity [citation] from which one can certainly infer a '"depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man."'" (*People v. Forster, supra*, 29 Cal.App.4th at p. 1757.)

Given the clear differences between a person convicted under a statute that imposes greater punishment for a recidivist drunk driver and another person that suffers a first-time conviction, we conclude the trial court erred in allowing defendant's felony drunk driving conviction to be used for impeachment.

Nonetheless, under the circumstances of this case, we find the error harmless. Generally, error in allowing a conviction to be used for impeachment is reviewed for whether it is reasonably probable the defendant would have obtained a more favorable result in the absence of the error. (*People v. Lang* (1989) 49 Cal.3d 991, 1012-1013; *People v. Castro, supra*, 38 Cal.3d at p. 319.) But even under the more stringent standard that requires a showing the error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]), defendant cannot prevail.

Defendant had also suffered two convictions for burglarizing cars, which he acknowledges were admissible for impeachment. Nor did the trial court's ruling dissuade defendant from taking the stand in his own defense. But more importantly, the jury would have learned about defendant's prior drunk driving conviction in any event. The neuropsychologist called by the defense to testify defendant suffered from P.T.S.D. stated he took the drunk driving incident into consideration in reaching his diagnosis. Thus, any error in allowing the prosecution to impeach defendant with his prior felony drunk driving conviction was harmless.

## 5. The Parole Revocation Fine

The trial court sentenced defendant to prison for a term of life without the possibility of parole for his murder conviction. In addition, the court imposed a consecutive term of 25 years to life based on the jury's finding he personally discharged a firearm causing death (Pen. Code, § 12022.53, subd. (d)) and, based on the jury's finding under Penal Code section 186.22, subdivision (b)(5), the court ordered that defendant serve a minimum of 15 years in prison.

Although not mentioned by the trial court on the record during the sentencing hearing, the abstract of judgment imposed a $10,000 parole revocation fine. Defendant contends it was error to impose that fine in this case. The Attorney General concedes this aspect of defendant's sentence should be struck. We agree.

Penal Code section 1202.45 requires a trial court assess a parole revocation fine "where a person is convicted of a crime and his or her sentence includes a period of parole." (Pen. Code, § 1202.45, subd. (a).) Defendant was sentenced to an indeterminate term of imprisonment. The case law holds that it is error to impose this fine where a defendant's "sentence include[s] no period of parole and he [is] sentenced to no determinate term." (*People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v.*

25

*Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)  Thus, we shall order the parole revocation fine stricken from the abstract of judgment.

DISPOSITION

The parole revocation fine is stricken and matter is remanded to the superior court with directions to prepare an amended abstract of judgment deleting this fine.  The superior court shall send a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.

RYLAARSDAM, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.